IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Biagio Stragapede | | |
| | Plaintiff, | Case No.: 1:12—cv—08879 |
| | v. | |
| | | Honorable Edmond E. Chang |
| City of Evanston | | |
| | Defendant. | |

## DEFENDANT CITY OF EVANSTON'S COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, City of Evanston ("City"), by and through its counsel, City of Evanston Law Department, and for its Combined Cross Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment, states as follows below.

## INTRODUCTION

Plaintiff's summary judgment motion draws on selected facts, evidence, and embellishment. Plaintiff's motion excludes facts that defeat his claims, and glosses over elements that he cannot meet. The burden of proof in this case lies solely with Plaintiff. Plaintiff is required to establish each and every element to support his single-count Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") claim. Plaintiff failed to do that. Plaintiff's motion for summary judgment should be denied and the City's cross motion for summary judgment should be granted in its entirety.

## STATEMENT OF FACTS

### I.  Background.

On or about June 10, 1996, Plaintiff was hired to work as a "Water Service Worker" with the City of Evanston. (SOF 4).[1] In September 2009, Plaintiff sustained an injury in a non-work related

---

[1] "SOF" refers to Defendant's Rule 56.1(a)(3) Statement of Facts, filed in conjunction with this motion.

accident. (SOF 5).  After this accident, Plaintiff was on medical leave not working for the City of Evanston until approximately June 2010. (SOF 6).

**II.      Essential functions.**

Plaintiff's written job description is one item that identifies some of his essential work functions. (SOF 6-8).One of the essential functions of Plaintiff's job as a water service worker was that he had to do his assignments the majority of the time independently.  (SOF 8). At all relevant times, Plaintiff's job as a water service worker was primarily field-based. (SOF 9-10). Plaintiff worked in the field by driving a City of Evanston vehicle to work site locations.  Most of the tools required to complete field assignments were stored in the vehicle. (SOF 11). Plaintiff admits that it is his responsibility when operating his work vehicle to "[o]perate it safely," and that he understands that duty to be "common sense." (SOF 12). Plaintiff admits that as a City of Evanston employee he was responsible for complying with safety regulations and those safety regulations included driving safely. (SOF 13).

According to Plaintiff his typical workday at the City of Evanston would consist of performing various essential tasks, including—but not limited to—collecting water samples, completing JULIE locate orders, and installing water meters. (SOF 14). A JULIE locate involves locating and marking otherwise obscured city infrastructure including water mains, sewer lines and storm sewer lines for persons doing construction work. (SOF 15). JULIE locate orders were separated into two categories in 2010: emergency and standard locates.  Plaintiff admits that emergency orders had to be completed within a two-hour period, and standard orders within a 24 or 48-hour period. (SOF 16). Although JULIE locate tickets were initially given to Plaintiff physically, over time JULIE tickets came to be primarily assigned to Plaintiff and other Water Service Workers electronically over the computer.  (SOF 17-18). Plaintiff does not know the general margin of error for a JULIE locate in 2010.    (SOF 19). Proper markings and caution must be used for JULIE

2

locates because of the potential danger and liability. (SOF 20-22). Likewise, water meter installation requires care and caution due to the potential danger. (SOF 23-25).

### III.     Plaintiff's return to work.

In order for Plaintiff to return to work for the City of Evanston after being on leave, he was required to obtain a fitness-for-duty evaluation from OMEGA Corporate and Occupational Health Services ("OMEGA"), which is the City of Evanston's occupational health care provider that is affiliated with NorthShore University Health System.  (SOF 27). A fitness-for-duty evaluation with OMEGA is a routine requirement for City employment and it is something required of City of Evanston employees after returning from long absences such as medical leave.  (SOF 28).

In a letter addressed to Judy Napoleon dated March 15, 2010, Dr. Jane Cullen of OMEGA stated that she evaluated Plaintiff in February 2010 but Plaintiff could not be cleared for duty at that time, and was he referred to a Dr. Zoran Grujic for further neurological assessment. (SOF 29). In letters to the City of Evanston dated April 6, 2010 and May 4, 2010, Dr. Zoran Grujic stated that he performed a neurological examination of Plaintiff, Plaintiff should be able to return to work at this time, and "[a] work trial is suggested over the next several weeks to make sure that [Plaintiff] is able to perform the functions of his job." (SOF 30).  In a letter to Judy Napoleon dated April 26, 2010, Dr. Cullen also recommended to the City of Evanston that Plaintiff perform a work trial.  (SOF 31). In June 2010, Plaintiff passed the work trial administered by the City of Evanston and in a letter dated June 7, 2010, Plaintiff was reinstated as worker service worker.  (SOF 32).

### IV.     Plaintiff's return to work.

Vicky Biner and Tim Bartus were Plaintiff's supervisors and in a position to make observations of his job performance. (SOF 32-33). Upon returning to work in June 2010, Plaintiff received training from Vicki Biner on the relevant computer programs used by a water service worker. (SOF 34). Contrary to Plaintiff's allegations in Paragraph 24 of his Complaint that the M-

Care and Earthnet software programs were new programs installed while he was on leave, Plaintiff admits that he used the M-Care and Earthnet programs before he went on medical leave. (SOF 35). Plaintiff admits that he received training a number of times from Tim Bartus on how to use test strips to take water samples. (SOF 36).

Plaintiff returned to work with two pencils, paper, map, and a tape recorder to help with recall. However, Plaintiff failed to take advantage of the tools available to him. (SOF 37). When Plaintiff came back to work with the City of Evanston in June 2010, his problems with the computer log-in happened several times a day, every day, and he would call Vicki Biner or come back to the office for assistance. (SOF 38). Biner would each time walk Plaintiff through his computer problems and she provided him with a written Post-it note with Plaintiff's name "Gino" as his login name and password. (SOF 39). Plaintiff admits that he had problems remembering his password for his work computer. (SOF 40). After his return to work, Plaintiff was observed driving through an intersection, not paying attention to the road, while looking at his feet. (SOF 41-43).

Sometime in June 2010, Plaintiff admits that he received an urgent JULIE locate for the address of 2672 Gross Point Road. Plaintiff admits that he could not complete that JULIE locate, and another person had to assist him to complete the locate (SOF 44-46). Plaintiff admits that he failed to perform a water shutoff at 1012 Lake Street in 2010. (SOF 47). On or around June 25, 2010, Plaintiff failed to complete a water meter installation at 2536 McDaniel, but instead spent approximately two (2) hours at the site talking to the contractor. (SOF 48). When asked by Vicki Biner for a reason why Plaintiff spent two (2) hours at the site and did not call the office, Plaintiff said he did not know. (*Id*).

On or around June 25, 2010, Plaintiff had a meeting with Lara Biggs and Tim Bartus, where Plaintiff was instructed to: remain in the field during the work day and not returning to the plant with certain exceptions; not place items on top of the laptop; and keep his full attention on his

4

surroundings when driving a City of Evanston vehicle (with a reference to the Sheridan Road and Lincoln Street intersection driving incident). (SOF 49-50). On July 1, 2010, Plaintiff tripped going up stairs at the City of Evanston Water Department on two (2) separate occasions. (SOF 51).

## V.     Administrative leave and subsequent proceedings.

On July 2, 2010, Plaintiff was notified that he was placed on administrative leave pending the City of Evanston's assessment of his ability to perform his essential job functions. (SOF 52).  In a letter dated July 16, 2010, Plaintiff's counsel, Andres J. Gallegos, objected to the stated grounds for Plaintiff's placement on administrative leave. (SOF 53). In a letter dated July 16, 2010, Dr. Grujic clarified to the City of Evanston his May 5, 2010 letter regarding Plaintiff's affected executive function. Dr. Grujic had been given a description of Plaintiff's recent work performance and noted, "Based on the information I received from you….I think [Plaintiff's work difficulties] are related to his executive dysfunction and are related to the brain injury he sustained last year."  (SOF 54; *see* SOF 55).

Plaintiff's counsel, Andres J. Gallegos, objected to further medical examination of his client, stating, "Dr. Grujic and Dr. Cullen both cleared Gino to return to work subject to a work trial….What is the basis for this request for another exam? Whom are they suggesting that he see? What is the purpose and scope of the examination?" (SOF 56). The City of Evanston responded to Plaintiff's counsel stating that the City was still evaluating Plaintiff's fitness for duty and that he would be asked to see Dr. Grujic, and that the proper steps should be taken so that all of the options can be explored. (SOF 57). Upon Plaintiff's refusal to participate in the requested medical assessment, City of Evanston solicited the advice of Dr. Zoran Grujic regarding what accommodations could be available to restore Plaintiff's ability to perform the essential functions of his position. (SOF 58).  Dr. Grujic advised the City of Evanston that "[b]ased on the examples provided…the simplest accommodation would involve having a co-worker go out on work

assignments with Mr. Stragapede….Other options include sending Mr. Stragapede for Vocational rehab/assessment to help in making a judgement [sic] as to what type of work he would be able to perform." (SOF 59).

The Water Service Worker position is an independent position, where the employee has his or her own vehicle and goes out on his or her own. To have a "helper" for Plaintiff to drive around and assist him in his job duties is not economically feasible and not an expectation of the position. (SOF 60). Providing a helper to assist Plaintiff in performing his job was not a reasonable accommodation. (SOF 61).

**VI.    Termination and subsequent proceedings.**

The City of Evanston terminated Plaintiff on September 24, 2010. (SOF 62). The City forwarded both of Dr. Zoran's stated accommodations, explaining first that the co-worker attachment solution "is not an accommodation that is reasonable for us to support either on a short or long term basis. (SOF 63).  The City further stated to plaintiff that "[i]f you participate in [Dr. Grujic's recommended participation in vocational assessment and rehabilitation], we would be willing to work with you regarding how we may be able to bring you back as a City of Evanston employee in the future." (SOF 64). Plaintiff, as grievant, was the subject of arbitration between his union, AFSCME Council 31, Local 1891 ("Union") and the City of Evanston. The Arbitrator issued a decision for the City of Evanston in determining that the city acted within its contractual rights in terminating Plaintiff "because of his inability to perform the functions of a Water Service Worker." (SOF 65).Plaintiff filed for Social Security Disability Benefits with the Social Security Administration claiming total disability. As of October 2012, Plaintiff started receiving disability payments from the Social Security Administration. (SOF 66).

**LEGAL STANDARD**

A summary judgment motion requests the Court to determine that any trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See Eckles v. CSX Transport., Inc.,* No. 09-CV-731-JMS-DML, 2010 WL 5509915 (S.D. Ind. Nov. 12, 2010) (*citing* FED. R. CIV. P. 56). To assess summary judgment, the Court provides all reasonable inferences in the non-moving party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2 (1986). However, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch,* 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must establish specific facts showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex,* 477 U.S. at 330. "The key inquiry is the existence of evidence to support a plaintiff's claims or affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact." *Eckles,* 2010 WL 5509915 (*citing Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir.1999)).

**ARGUMENT**

Plaintiff admits that he bears the burden of proof in this case. (Dkt. 29, pp. 6-7). To meet that burden, Plaintiff must establish that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) the City took an adverse job action against him because of his disability or without making a reasonable accommodation for it. *Winsky v. Cook County,* 563 F.3d 598, 603 (7th Cir. 2009). To survive the City's summary judgment motion, Plaintiff must "present the court with evidence that, if believed by a trier of fact, would establish *all three* elements of his claim." *Kotwica v. Rose Packing Co., Inc.,* 537 F.3d 744, 748 (7th Cir. 2011). Plaintiff failed to do so. First, Plaintiff adopts an inappropriate and broad definition of "disabled" which fails to meet the requirements of the ADA. Second, Plaintiff's own testimony and admissions reveal that he failed to perform the essential functions of his job, with or

without reasonable accommodation. Finally, Plaintiff, thru his attorney, frustrated the accommodative process such that the City was prevented from offering an accommodation for the Plaintiff's alleged disability.

## I.     Plaintiff failed to establish that he is disabled.

Plaintiff's arguments regarding his claimed disability are puzzling. Plaintiff continuously asserts that the City "admitted" that Plaintiff was disabled. *See* (Dkt. 29, p. 8). Plaintiff cites to nothing in the record to support this assertion. *See* (Dkt. 29, pp. 8-9). Plaintiff references the word "disability" as a catchall.

The ADA defines disability as follows: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff failed to meet any of these three definitions.

### A. Physical or mental impairment that substantially limits one or more major life activities.

Plaintiff does not outright claim "a physical or mental impairment that substantially limits one or more major life activities," as he references only the second and third factor in his summary judgment motion. *See* (Dkt. 29, p. 8). Nonetheless, the record is devoid of any facts to support that Plaintiff has any impairment that "substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(1).

The ADA's fairly broad definition of "major life activities" encompasses a variety of life activities from "walking" to "working." *See* 42 U.S.C. § 12102(2)(A-B). The ADA defines "substantial limitations" as follows: "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l)(iv).

Plaintiff's Complaint and Plaintiff's deposition testimony is devoid of any identification of a

"substantial limitation" on any "major life activity." *See* (Dkts. 1, 29; *see generally* PSOF, Exhibit 1). In fact, Plaintiff's own testimony and statement of facts indicate that Plaintiff was able to see, eat, sleep, walk, stand, lift, bend, speak, breath, learn, read, concentrate, think, communicate, and work, and operate his major bodily functions. *See e.g.* (Dkt. 30, ¶¶ 29-31, 55; *see generally* Exhibit 1). The record is completely devoid of any actual claim that Plaintiff had a substantial limitation as compared to most people in the general population. *See* 29 C.F.R. § 1630.2(j)(l)(iv). Thus, Plaintiff fails to meet this first factor of establishing disability pursuant to the ADA.

**B. A record of a physical or mental impairment that substantially limits one or more major life activities or being regarded as having a physical or mental impairment that substantially limits one or more major life activities.**

Plaintiff repeatedly claims that the City "unequivocally admitted" that Plaintiff was disabled. (Dkt. 29, p. 8). Plaintiff improperly uses the word "disability" interchangeably with the definition of "disabled" under the ADA. These are not the same. "Merely having a physical injury or a medical condition is not enough." *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011).

Plaintiff claims that references were made to Plaintiff's disability in "terminating correspondence." (Dkt. 29, p. 8). This assertion is wrong, as evidenced by the authority used to support it. *See* (Dkt. 30, ¶¶ 15, 20, 47-53, 61). Plaintiff's letter of termination did not identify a disability. (SOF 62). Plaintiff's references a series of "draft" termination letters that were circulated between several City staff prior to terminating Plaintiff. *See* (Dkt. 29, p. 8; Dkt. 30, ¶ 48). First, these "draft" letters were not signed, not sent, and constantly modified and altered. *See* (*Id.*). The final draft termination letter did not reference any "disability." *See* (SOF 62). Second, these draft letters produced in discovery are non-relevant non-admissible hearsay, which cannot be used to support Plaintiff's claim. *See* FED. R. EVID. 801; FED. R. CIV. P. 56(c)(1); *see Jones v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 75 F. Supp. 2d 885 (N.D. Ill. 1999). Therefore, these letters are not binding on the City's ultimate basis for Plaintiff's termination and are not admissible evidence.

Plaintiff next identifies the City's request for "medical information" from one of the "City's physicians, Dr. Grujic" as an acknowledgement of disability. First, a physical examination with OMEGA, an independent medical organization, is a routine requirement for City employment. (SOF 27) Second, the physical examination is something required of City employees after returning from long absences. (SOF 28). Third, Plaintiff initially voluntarily submitted to these "fitness for duty" examinations by OMEGA (Dr. Grujic), then later refused to do them. (SOF 29-30, 56); *see also* 29 C.F.R. 1630.14 (West 2013). The ADA permits employers to "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. 12112(d)(4)(B); *see generally Coffman v. Indianapolis Fire Dept.,* 578 F.3d 559 (7th Cir. 2009). There is no evidence that examinations by Dr. Grujic and OMEGA were anything but  inquiries into Plaintiff's ability to perform his job-related functions, and such conduct/events are not "admissions" that Plaintiff was disabled under the scope of the ADA.

In this case, Plaintiff is adamant that there were no requests for special accommodations (Dkt. 30, ¶ 32); Plaintiff refused to disclose medical details of his injuries (Dkt. 30, ¶ 8); Plaintiff never claimed to have any "mental impairments;" and Plaintiff agreed to undergo the fitness for duty examinations. There is nothing to show that Plaintiff met his burden to establish a record of disability or "regarded as" disability within the meaning and scope of the ADA. Summary judgment should be granted to the City.

**II.     Plaintiff's social security benefits contradicts his ADA disability claim.**

Throughout the course of this litigation, Plaintiff has been extremely reticent about his application for social security disability benefits. Plaintiff's counsel adamantly refused to produce Plaintiff's application for social security claiming that these records are not relevant, and claiming a strange assortment of privileges. (SOF 66 and corresponding Exhibits). On September 10, 2013

counsel produced correspondence confirming social security payments to Plaintiff starting October 2012. (*Id.*).

To receive disability benefits under the Social Security Act, an individual must be considered "totally disabled." *See* 42 U.S.C. 423 (West 2013). Plaintiff's application for social security disability was obviously accepted as payments commenced on October 2012. (SOF 66). Plaintiff filed the instant action in November 2012. *See* (Dkt. 1). "A plaintiff cannot avoid summary judgment merely by asserting that []he is a qualified individual if []he made prior statements, in applying to SSDI, regarding [his] disability that are squarely contradictory." *Feldman v. Am. Mem. Life. Ins. Co.,* 196 F.3d 783, 791 (7th Cir. 1999). Plaintiff convinced the social security administration of his total disability in receiving disability benefits. (SOF 66). Now, in this litigation, Plaintiff "now explains flatly that []he was able to perform the essential functions of [his] job, with or without reasonable accommodations and, thus, was a 'qualified individual.' This bald statement, without more, crashes face first against [his] claim of totality disability in [his] SSDI application." *Id.* The Seventh Circuit confirms that it "cannot permit litigants to adopt an alternate story each time it advantages them to change the facts." *Id.* Where Plaintiff presents "no explanation of the contradiction between" his claim of total disability with the Social Security Administration and his claims in this action, Plaintiff cannot defeat summary judgment. *See id.*

Plaintiff failed to produce sufficient evidence to establish that he is a qualified individual under the ADA. Plaintiff's disability claim is defeated with Plaintiff's adamant refusal to produce anything to address the "apparent inconsistency" between his social security total disability claim and his representations that he could complete the essential functions of his position with or without reasonable accommodation. *See* (Dkt. 30, ¶¶ 29, 32).

### III.   Plaintiff failed to establish that he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.

Plaintiff failed to meet his burden to establish disability within the meaning and scope of the

ADA. However, even if this Court accepts Plaintiff's position, Plaintiff still fails to establish that he is otherwise qualified to perform the essential functions of his job. Plaintiff's summary judgment argument focuses solely on Plaintiff's job description and only one of the many problems Plaintiff had in completing the essential functions of his position. *See* (Dkt. 29, pp. 9-11). However, the evidence and testimony reveal Plaintiff's pattern of failure in performing the essential functions of his position. Plaintiff testified and conceded repeated failures and mistakes impeding his ability to perform the essential functions. (SOF 37-51; PSOF, Exhibit 19, Dkt. 41).

29 C.F.R. § 1630.2 defines essential functions as follows:

> The function may be essential because the reason the position exists is to perform that function; [and/or] . . . the limited number of employees available among whom the performance of that job function can be distributed; and/or . . . the function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function . . . Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(1) and (n)(2). The ADA is not meant to shelter disabled individuals from failing to meet employer expectations for reasons outside of disability – such as poor work ethic, carelessness, unprofessional demeanor, bad attitude or insubordination. *See Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 862 (7th Cir. 2006) (*citing Williams v. United Ins. Co. of Am.,* 253 F.3d 280, 282 (7th Cir. 2001)). The ADA is not meant to exempt individuals who are disabled or otherwise from using "care and caution in the workplace and [] adher[ing] to . . . safety policies and requirements, as well as directives." *Id.* The ADA does not require employers to condone

"irresponsible behavior from an employee, who . . . despite repeated warnings, failed to follow or comply with" employer rules and policies. *Id.* at 863. The ADA provides no protection to a disabled employee who, for reasons unrelated to disability, "performs in such an unsatisfactory manner that he fails to keep up with the production pace and abide by the quality-control standards" of an employer. *Id.* The lengthy pattern of incidents leading to Plaintiff's termination reveals his inability to perform the essential functions of his job – with or without accommodation.

Plaintiff was a water service worker for the City. (SOF 4). Plaintiff's job description detailed his essential functions. (SOF 6). As a water service worker Plaintiff was required to work independently, predominately in the field. (SOF 8-9). In that capacity, Plaintiff was tasked with installation and repair of water meters and meter systems, collection of water samples for chlorine testimony, commercial and residential water shutoffs throughout the City, and completing "Joint Underground Locating Information for Excavators ("JULIE") water locates . (SOF 14-16). Plaintiff worked in the field by driving a City of Evanston vehicle to work site locations. Most of the tools required to complete field assignments were stored in the vehicle. (SOF 11). At times, work with water meters would require Plaintiff to crawl into a confined crawl space or other entry, including a "pit installation." (SOF 23-24). JULIE locate tickets came through the City's "EarthNet" Software system, which has been in place since approximately 2007 or 2008. (SOF 17-18). Precision and crucial are important when completing JULIE locates, both for the safety of the water service worker, other persons in the field, and because any mismarked JULIE site may result in the City's direct financial liability. (SOF 19-21).

### A. **Computer deficiency.**

When Plaintiff returned to work, he received refresher training on the computer and computer programs, including M-Care and EarthNet. (SOF 34-35). Plaintiff was provided his computer password on a stickey note to affix to his computer. (SOF 39). The password was

13

Plaintiff's name, "Gino." (*Id.*). Plaintiff received training and instruction, a number of times on the chlorine test he was required to complete. (SOF 36). He was also permitted to use recording and memory aid devices, such as a voice recorder, maps, pencil, pens, paper, and notepads. (SOF 37).

Despite the cumulative and often repeated training, and the tools to assist him, Plaintiff had significant technological problems with recalling his password, changing screens on the computer, accessing JULIE tickets on the computer, and matching up site locations with the information presented to him on the computer. (SOF 38-40). Plaintiff admits he declined to use the recorder to assist his recall issues. (SOF 37). Plaintiff claims it is "axiomatic" that use of a computer was not an essential function of Plaintiff's job because the City had printed JULIE tickets out in the past and should have accommodated Plaintiff with paper printouts of JULIE tickets. (Dkt. 29, p. 13). First, retrieval of JULIE tickets electronically was not a new development that occurred upon Plaintiff's return to work. *See* (SOF 35). Second, the use of a computer was always an essential function of the job for years. *See* (SOF 17-18, 35). Simply because retrieval of JULIE tickets electronically is something that was not done in the past or something that is not done currently is irrelevant as to whether use and access to the computer was an essential function of Plaintiff's job *at the time*. *See generally Gratzl v. Office of the Chief Judges*, 601 F.3d 674 (7th Cir. 2010); *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 484-85 (7th Cir. 2002) ("Under the ADA, an employer is not required to modify, reduce, or reallocate the essential functions of a job to accommodate an employee."). Third, the constant and mission critical use of a computer extended far beyond retrieval of JULIE tickets. While Plaintiff frames his inability to perform with the computer as an "excuse" to terminate him, it was a legitimate function that the City deemed essential – such that all employees in the department were expected to have the same computer skills and proficiency. *See* (SOF 17); 29 C.F.R. § 1630.2(n)(2).

14

B. **Health and safety.**

At all relevant times, Plaintiff admits that to perform the essential functions of his job at the City he needed to drive safely (SOF 12-13, 41-43). he needed to have a heightened sense of awareness to protect the health and safety of himself and others (SOF 12-13, 43), and he needed to be physically aware of his surroundings due to the potential dangers of his position. (*Id.*). Yet, the record demonstrates that Plaintiff posed a safety risk to himself and others by his dangerous inability to perform the essential functions of his position.

For example, Plaintiff was unable to locate worksites, getting lost, and in one instance went to the wrong location completely (SOF 44-45). Plaintiff failed to complete several jobs including a water shut-off and JULIE locate for no explained reason. Plaintiff admittedly ran through an intersection and nearly got in a car accident because he was "looking at his feet" (SOF 41-43). Plaintiff tripped twice in a single day at the water department (SOF 51).

Plaintiff claims that "at no time was Plaintiff found to be a direct threat." (Dkt. 29, p. 13). For support, Plaintiff solely relies on Dr. Grujic's evaluation of Plaintiff. *See* (Dkt. 30, ¶ 55). However, first, the City is not adopting the "direct threat" exception under the ADA when addressing Plaintiff's health and safety challenges. Rather, the City is identifying another category of essential functions that Plaintiff has failed to meet. As noted in *Hammel,* the City is "entitled to expect its workers, disabled or otherwise, to use care and caution in the workplace, and to adhere to [] safety policies and requirements." *Hammel,* 407 F.3d at 862. Plaintiff admittedly failed to do so in this case. Second, Dr. Grujic clearly admits that he would defer to Plaintiff's supervisors and City staff when assessing Plaintiff *in the field* and his performance therein. *See* (SOF 55). As illustrated by the foregoing, Plaintiff's performance in the field reveals that Plaintiff failed to meet the essential functions of his position requiring caution and safety.

### C. **Insubordination and other deficiencies.**

Plaintiff's brief fails to address admitted facts of other deficiencies of Plaintiff performing his essential job functions. Admittedly, one of the essential functions of Plaintiff's position was to collect water samples for analysis. (SOF 7). Plaintiff received repeated instructions on how to conduct the sampling. (SOF 36). Additionally, written instructions were available to Plaintiff on the test kit used to collect water samples. (*Id.*). Regardless, Plaintiff still failed to complete this essential function.

Plaintiff returned to the office several times throughout the day to the point at which it became disruptive of his work, and Plaintiff was requested to stop his frequent trips back to the office. (SOF 49-50). Plaintiff had all of the tools necessary for his off-site work available to him on his truck. (SOF 11). Regardless of the reasoning behind his returns to the office, Plaintiff admits that he was repeatedly requested to cease this disruptive and inefficient action, and yet continued to do so. (SOF 49-50). This is unrefuted evidence of his insubordination in the record. *See* (*Id.*).

One of the primary essential functions of Plaintiff's role is to work independently and to efficiently complete water shutoffs and JULIE tickets. (SOF 7-8). Plaintiff admitted that there were multiple instances where he was unable to complete a job alone, and others had to either assist or complete the job for him. (SOF 44-48). Plaintiff admitted that there were times where he spent hours on a jobsite, but could not explain why.

Plaintiff himself stressed the importance of accurate JULIE locates and that the margin of error with a JULIE locate is strict. (SOF 20). Likewise, Plaintiff identified the heightened sense of awareness required to complete a JULIE locate, for both accuracy and safety. (SOF 22). Yet, there was a situation where Plaintiff was unable to complete a JULIE locate. *See* (SOF 44-46). More troubling, during his deposition, Plaintiff failed to identify the general margin of error allowed for a person conducting a JULIE locate. (SOF 19). Of course, this standard should have been well

16

known to him given his 14 years with the City.

Plaintiff's constant on-the-job deficiencies were observed continuously from June 7, 2010 through July 2, 2010, when he was placed on administrative leave. *See* (SOF 26-52). Plaintiff's failure to heed warnings and complete some of the main functions as a water service worker reveal further failure of Plaintiff to meet the essential functions of his position.

### D. Summation.

Plaintiff's fallback argument is that the City discharged him in retaliation and but-for his disability, he would not have been terminated. *See* (Dkt. 29, p. 11). Plaintiff cites to no facts or authority to support this claim, aside from Plaintiff's own exaggerated extrapolation of inadmissible hearsay. *See* (Dkt. 30, ¶¶ 47-48). The City's basis for Plaintiff's discharge was that Plaintiff failed to meet the essential functions of his position. (SOF 62).

When Plaintiff sought to return to work, Dr. Cullen evaluated Plaintiff and indicated that Plaintiff could not be cleared for duty at that time, and therefore he was referred to Dr. Grujic for further neurological assessment. (SOF 29). After his examination, Dr. Grujic indicated that Plaintiff retained mild residual cognitive deficits affecting retrieval memory and executive function, but could return to work after a work trial. (SOF 30). Plaintiff passed his work trial, and was reinstated as a water service worker. (SOF 31). Upon returning to work, Plaintiff received training on the necessary computer programs and use of the chlorine test. (SOF 34, 36). He also had with him a voice recorder, maps, pencil, pens, paper, and notepads. (SOF 37). Plaintiff did not use tools available to him to assist in performing the essential functions of his job. (*Id.*).

Plaintiff's deficiencies in performing the essential functions of his job extend beyond computer and technological literacy into the actual enumerated "essential functions" identified in Plaintiff's job description. *See* (SOF 6-25). Plaintiff did not complete water sample collections for analysis. *See* (*Id.*). Plaintiff did not complete water shutoffs (SOF 49). Plaintiff did not accurately

17

complete JULIE locates. (SOF 44-45). Plaintiff drove unsafely. (SOF 41-43). Essentially, Plaintiff was unable to work independently. Futher, Plaintiff disregarded supervisory direction to cease certain behavior like returning to the office as frequently as he did. (SOF 49-50).

Like the plaintiff in *Hammel,* Plaintiff failed to abide by safety regulations; Plaintiff was insubordinate in continuing his behavior despite supervisory instruction to the contrary; Plaintiff was inefficient and reduced "productivity" by taking too much time on job sites; Plaintiff did not use the tools available to him to potentially aid his work; other persons had to complete Plaintiff's tasks for him; and Plaintiff exhibited signs of carelessness without completing his work to the standards expected of him. (SOF 38-50). All of these facts reveal that Plaintiff did not perform the essential functions of his job, and was therefore not "otherwise qualified to perform the essential functions of his job with or without reasonable accommodation." *See Winsky,* 563 F.3d at 603. The City's cross motion for summary judgment should be granted.

### IV. Suggested Accommodations.

In *Hammel*, 407 F.3d at 865-66, the Court stated that:

> Employers are not required to "isolate the disability-related causes for an employee's inferior performance from problems that stem from a poor attitude, insubordination, carelessness, or outright disregard for the safety of himself and his co-workers. Instead, an employer is entitled to conclude that termination is warranted solely on the basis of the employee's patent inability to perform his job in manner [sic] that meets the essential requirements of that position. This is true even if, after further inquiry, an employer determines that the employee's inability to perform the job 'is due entirely to a disability' . . . [a]n employer is only in violation of the ADA if a terminated employee can establish that reasonable accommodations exist that would have enabled that person to perform the essential functions of his or her job.

In his brief, Plaintiff's only suggested "accommodation" was for the City to have printed JULIE tickets and job routes for Plaintiff to rely less on his laptop and reduce his trips to the office. *See* (Dkt. 29, pp. 12-13). Putting aside the feasibility or reasonableness of these suggested

18

accommodations, these accommodations do not address, let alone solve, Plaintiff's insubordination, inefficiency, failure to adhere to safety expectations, and inability to complete the essential functions of his job. Plaintiff suggests nothing to the contrary. Plaintiff's failure to complete his job functions extends beyond his disability – and no accommodation would solve or address these deficits. *See Hammel,* 407 F.3d at 862-63; *Hoppe v. Lewis Univ.,* No. 09 C 3430, 2011 WL 4578352, *9 (N.D. Ill. Sept. 30, 2011).

Plaintiff admits that he was given the accommodations that he requested from the City. (Dkt. 29, pp. 7, 13). Plaintiff requested that he be able to use pens, pencils, paper, maps, notes and a recording device, that he receive computer help, and that he be able to seek assistance from his supervisors. (*Id.*). "[T]hese accommodation requests were not only granted by Defendant, but made part of [Plaintiff's] return-to-work protocols." (*Id.* at p. 7). "At no time did Plaintiff make a request for a person to ride along with him day-in and day-out." (*Id.* at p. 12). In fact, Plaintiff claims that "he had proven himself able to work independently in the field upon his return to work." (*Id.* at p. 4). Nonetheless, Plaintiff claims that this is an option that should have been discussed with Plaintiff prior to termination. *See* (Dkt. 29, p. 4). Plaintiff's claim as to reasonable accommodation is focused solely on the City's alleged failure to "initiate a flexible interactive process . . . to determine a reasonable accommodation in the event a deficiency was noted." (*Id.* at p. 7). Therein lies the crux of Defendant's argument - the City tried to engage the Plaintiff through his counsel (SOF 53, 56-58; Dkt. 8-1, Exhibits 1-3), but Plaintiff and his counsel frustrated the process and refused to participate (*Id.*). The City could not proceed to engage in an interactive process and had no alternative but to terminate Plaintiff. (SOF 62).

## V. Failure to engage in the interactive process.

The claimed failure to engage in the interactive process is not in itself a basis for liability under the ADA. *Basden v. Prof'l Transp., Inc.,* 714 F.3d 1034, 1039 (7th Cir. 2013) "Even if an

employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation." *Id.* As specified at length in the preceding sections of this brief, some of the essential functions of Plaintiff's job were that he was required to drive; to work independently; to complete water shut-offs and JULIE locates; and to collect water samples. *See generally* (SOF 25). Plaintiff failed to perform these functions. *See* (discussion of Plaintiff's failure to perform essential functions, Section III *supra*).

There is no accommodation (reasonable or not) outside of having another person do all or a part of Plaintiff's job for him. Plaintiff has failed to identify any alternative accommodation. It is "axiomatic" that the ADA does not require that a "helper" or other employee be brought on to assist with or do the job of a disabled person. *See e.g. Majors v. Gen. Elec. Co.,* 714 F.3d 527, 534 (7th Cir. 2013) ("To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation."); *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 912 (7th Cir.1996) (suggested accommodation of hiring a helper was not a reasonable accommodation). Simply put, hiring a "helper" for Plaintiff because Plaintiff was incapable of doing his job is not considered a reasonable accommodation, as the City would essentially have to have two full-time employees doing the job of one. *See* (SOF 60-61). Defendant is entitled to summary judgment since the record is absent of any evidence establishing that Plaintiff was able to complete the essential functions of his job with an accommodation, regardless of Plaintiff's alleged refusal to engage in the interactive process.

**VI. Plaintiff and his counsel's actions caused a breakdown in the interactive process.[2]**

---

[2] In light of the arguments set forth in this section, the obvious conflict of interest addressed in the City's Motion to Disqualify Counsel (Dkt. 8) is raised yet again. Should this case proceed to trial, the City reserves its right to call Mr. Gallegos (who is in the same practice group and works directly with Ms. Stevenson) as a necessary adverse witness to the breakdown of the interactive process.

Even if the analysis of Plaintiff's ADA claim reaches this point, Plaintiff's ADA claim is still defeated due to Plaintiff and his counsel's conduct in causing the breakdown of the interactive process. Plaintiff alleges that where a "deficiency was noted," the City failed to initiate a flexible interactive process with the Plaintiff to determine a reasonable accommodation. (Dkt. 29, p. 7).

In addressing this element, Plaintiff clearly avoided the elephant in the room when addressing the "interactive process," namely Plaintiff counsel's own refusal to allow Plaintiff to engage in the interactive process. The relevant sequence of events are identified below.

With the City's concerns over Plaintiff's performance on the job, it placed Plaintiff on administrative leave. (SOF 52). Once the City placed Plaintiff on paid administrative leave, Plaintiff's attorney at Robbins, Salomon & Patt, Andres Gallegos ("Gallegos"), maintained regular contact with the City. *See* (Dkt. 8-1, Exhibits 1-3). On July 8, 2010, the City sent Gallegos an email which listed and explained the City's concerns with Plaintiff's memory and performance. (Dkt. 8-1, pp. 13-14, "Exhibit 2").

On August 13, 2010, the City sent Gallegos an email advising him that HR will be contacting Plaintiff and that Plaintiff will be meeting with HR and the City Manager. (Dkt. 8-1, pp. 18-19 "Exhibit 3"). On that same date, Gallegos asked the City via email whether counsel and Plaintiff's spouse may attend the meeting. (Dkt. 8-1, p. 18, "Exhibit 3"). On August 13, 2010, the City replied:

> [s]ince [it] would consider [Plaintiff] a represented party, and since [it] does not believe that anyone from the law department is planning on attending the meeting, [it] is not sure whether Gallegos presence at the meeting would be ethically appropriate.

(*Id.*). The City further stated in that email that Gallegos risks making himself "a witness in that case if details of the meeting are put at issue." (*Id.*). Gallegos later advised the City that Plaintiff instructed Gallegos to attend the meeting. (Dkt. 8-1, p. 17, "Exhibit 3"). On August 16, 2010, Gallegos further

---

Accordingly, the City requests that this Honorable Court revisit the City's Motion (Dkt. 8) should the need arise.

instructed the City as follows: "when scheduling a meeting between the City and [Plaintiff], we ask that the City coordinate that meeting through me and not contact [Plaintiff] directly." (*Id.*). On or about August 23, 2010, the City advised Gallegos that it required a more comprehensive analysis to determine whether Plaintiff was capable of performing the essential functions of his position. (SOF 57). In that email, Gallegos was notified that the City would be requesting that Plaintiff submit to a medical examination by the City's doctor. (*Id.*).

On August 24, 2010, the City received correspondence from Gallegos, in which he rejected the City's request to have Plaintiff evaluated by the City's doctor. (Dkt. 8-1, pp. 9-11, "Exhibit 1"). In that correspondence, Gallegos also states that the City's request was "overreaching, unwarranted and exceeds the scope of the City's right to request it under 29 C.F.R. § 1630.13(b)." (*Id.*). Plaintiff's outright refusal to submit to the medical examination resulted in an irretrievable breakdown of the City's attempts to engage in the interactive process with Plaintiff. This failure of the process, which is solely Plaintiff and attorney Gallegos' fault, left the City with no option but to proceed with the termination of Plaintiff because no reasonable accommodation could be assessed to allow him to perform his essential job functions in a safe and efficient manner.

Plaintiff was terminated on September 24, 2010. (SOF 62). Nonetheless, in Plaintiff's termination letter, the City *still* gave Plaintiff the option to participate in recommended vocational assessment and rehabilitation to rebuild a working relationship with the City. *See* (*Id.*). Attorney Gallegos refused this opportunity to revisit the accommodative process and Plaintiff then filed this action. *See* (Dkt. 1). It is evident from the foregoing facts that Plaintiff's counsel refused to permit his client to submit to any further neurological analysis for the City to assess Plaintiff's performance and potential accommodations.

*Swanson v. Allstate Ins. Co.,* 102 F. Supp. 2d 949 (N.D. Ill. 2000), is instructive in this case. In *Swanson*, the plaintiff was returning from an illness leave of absence. *Swanson,* 102 F. Supp. 2d at 960.

To facilitate her return, Swanson requested an accommodation from Allstate in the form of limited work days and that she not report to her previous supervisors, as was recommended by her psychiatrist. *Id.* at 961. Swanson represented that she could perform all of her essential job functions with the potential exception of reporting to her prior supervisors. *Id.* Allstate did not deny Swanson's requests, but requested that she undergo an Independent Medical Examination ("IME"). *Id.* Swanson agreed. *Id.* The IME doctor's opinions varied significantly from Swanson's psychiatrist. *Id.* The IME doctor opined that Swanson could not return to her position because she would be "overwhelmed with anxiety." *Id.* at 962. To resolve the discrepancy and to identify the appropriate course of action, Allstate requested a second IME with the doctor being selected by Swanson's psychiatrist and by the first IME doctor. *Id.* Swanson's attorney then responded indicating that Swanson refused to submit to a second IME and requested if Allstate was binding itself to the opinions of the first IME doctor. *Id.* Allstate responded that it was not rejecting Swanson's request to return to work, but rather it was trying to "evaluate whether" she was fit to do so. *Id.* Swanson was firm in her refusal to submit to a second IME. *Id.* Allstate was left with no choice but to terminate her employment. *Id.* at 963. Swanson sued alleging ADA violations, claiming that Allstate failed to reasonably accommodate her disability. *Id.* Concerning Swanson's ADA claim, Judge Schenkier granted summary judgment to Allstate. *Id.* at 978.

29 C.F.R. § 1630.2(o)(3) states in pertinent part, "[i]t may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3) (West 2013). As a matter of law and fundamental fairness, "No party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability . . . A party that obstructs or delays the interactive process is not acting in good faith." *Swanson,* 102 F. Supp. 2d

23

at 976. The *Swanson* Court put the responsibility of the breakdown of the interactive process with

Swanson. *Id.* at 976-77. It noted:

> Rather than agree to the that [sic] final IME, Ms. Swanson elected to
> cut off the interactive process before it was done, and to resort
> instead to the legal process. That was her choice, of course, but
> having made it, she cannot complain that Allstate failed to
> reasonably accommodate her. Although the interactive process need
> not go on indefinitely before legal action is taken if the process
> proves to be fruitless, responsibility for a breakdown in the process
> caused by an employee's unreasonable failure to help the employer
> determine what specific accommodations are necessary must be
> assigned to the employee . . . Ms. Swanson's refusal to allow herself
> to be examined a second time was not reasonable, and frustrated
> Allstate's legitimate effort to determine whether [she] had a disability
> and what accommodations were necessary to allow her to do her
> job.

*Id.* at 977-78.

The unreasonable actions by Plaintiff and his attorney in this case mirrors what happened in

*Swanson*. The City was left in a position where there was a "deficiency" and it reasonably sought in

good faith to identify a reasonable accommodation for Plaintiff to continue working in his position.

*See* (SOF 62). Yet, despite his previous agreement to submit to an examination by Dr. Grujic,

Plaintiff, through his counsel, later refused to proceed. The City could not identify specific

reasonable accommodations, since Plaintiff's counsel refused to assist or provide the information

necessary to reach that determination. (*Id.*). Plaintiff failed to offer alternative reasonable

accommodations to address the City's concerns. Instead, Plaintiff acted in bad faith with the

purpose of inflicting possible liability upon the City. Like Allstate, the City had no choice but to

terminate Plaintiff. Overall, the City's cross motion for summary judgment should be granted and

Plaintiff's motion for summary judgment should be denied.

## CONCLUSION

Plaintiff has failed to establish that he is "disabled" within the meaning and scope of the

ADA. Plaintiff has admitted that he failed to meet the essential functions of his job. Plaintiff has failed to establish that any reasonable accommodation to remedy the deficiencies in performing the essential functions of his job. Plaintiff and his counsel's own actions caused a complete breakdown in the interactive process. Unfortunately, this lawsuit ensued. This Court should grant the City's summary judgment in its entirety.

WHEREFORE, for the reasons articulated herein, Defendant, City of Evanston's respectfully requests that the Court grant its Cross Motion for Summary Judgment and deny Plaintiff Biagio Stragapede's Motion for Summary Judgment in its entirety.

Respectfully submitted,

/s/ W. Grant Farrar # 6255911
Attorney for Defendant

W. Grant Farrar, Corporation Counsel
Henry J. Ford, Jr., Assistant City Attorney
Ghazal Sharifi, Assistant City Attorney
City of Evanston Law Department
2100 Ridge Avenue, Suite 4400
Evanston, IL 60201
(847) 866-2937
(847) 448-8093 (fax)