**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BIAGIO STRAGAPEDE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 08879 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF EVANSTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Biagio "Gino" Stragapede alleges that his former employer, Defendant City of Evanston, discriminated against him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*[1] After a week-long trial, the jury found in favor of Stragapede and awarded him $225,000 in compensatory damages, that is, damages for emotional pain and suffering, both past and future. R. 127, March 13, 2015 Minute Entry. The issue of equitable remedies—back pay and front pay—was reserved for the Court. R. 105, Feb. 22, 2015 Pretrial Order at 1. On June 9, 2015, the Court held an evidentiary hearing on damages. R. 144, June 9, 2015 Minute Entry. Both parties submitted pre-hearing and post-hearing briefs to support their arguments. R. 137, Pl.'s Pre-Hrg. Br.; R. 140, Def.'s Pre-Hrg. Resp. Br.; R. 147, Pl.'s Post-Hrg Br.; R. 148, Def.'s Post-Hrg. Resp. Br.; R. 149, Pl.'s Post-Hrg. Reply Br. For the reasons discussed below, the

---

[1]The Court has subject matter jurisdiction over this federal-question case under 28 U.S.C. § 1331. Citations to the docket are "R." followed by the entry number and, when necessary, the page/paragraph number.

Court finds that Stragapede is entitled to $354,070.72 in back pay plus post-judgment interest. Stragapede is not entitled to an award of front pay.

## I. Findings of Fact

Gino Stragapede began working as a water service worker for the City of Evanston in 1996.[2] In 2009, Stragapede suffered a non-work-related head injury that required months of medical care and left him with some residual memory and cognitive problems. After his recovery, Stragapede asked the City if he could return to work. The City first asked Stragapede to get a fitness-for-duty evaluation administered by a neurologist, who concluded that Stragapede would be able to return to work after a supervised work trial. Stragapede passed the work trial, and he was reinstated as a water service worker in June 2010.

When he was working at the City of Evanston, Stragapede's salary was governed by the collective bargaining agreement between the City and the American Federation of State, County, and Municipal Employees. *See* Pl.'s Exh. 9, Union Contract. That agreement sets forth the rates of pay and schedules for longevity raises for union workers like Stragapede. *Id.* Stragapede also often worked overtime throughout his years as a water service worker. He would volunteer for overtime assignments and enjoyed bringing home extra money to support his family. In addition to wages and overtime, Stragapede received health

---

[2]These facts are drawn from the evidence presented at trial, in the evidentiary hearing, and exhibits submitted by the parties. Neither party in this case ordered transcripts of the trial or the evidentiary hearing, so the Court does not include page- and line-number citations to testimony from the in-court proceedings. If the parties intend to file post-trial motions, then they must order official transcripts so that precise evidence can be cited. They cannot rely on the video of the trial, which was part of a pilot project and cannot be deemed the official record.

insurance and contributed to a pension plan. The City also made contributions to Stragapede's pension. R. 134, Proposed Pre-Hrg. Order at 3 ("During the years 2009-2015, the City paid between 8.5% to 11.79% on behalf of eligible City employees to the Illinois Municipal Retirement Fund.").

Less than a month after Stragapede returned to work, the City placed him on administrative leave pending an assessment of his ability to perform his essential job functions. Stragapede's supervisors had supposedly become concerned with his performance. They testified about Stragapede's difficulty with using his laptop in the field, his alleged distracted driving, his alleged failure to complete various tasks, and his alleged frequent returns to the water plant. Stragapede acknowledged that he had some limitations due to his brain injury, but he claimed that he could still perform the essential functions of his job with simple accommodations. Shortly after Stragapede was placed on administrative leave, the communications between Stragapede and the City broke down. In September 2010, the City fired Stragapede. After a weeklong trial, a jury concluded that Stragapede was qualified to perform the essential functions of his job with reasonable accommodations, and that Evanston fired him because of his disability. March 13, 2015 Minute Entry.

After he was fired, Stragapede started to look for work. Pl.'s Exh. 10, Stragapede Applications. He submitted two applications in the remaining months of 2010, roughly forty applications in 2011, and ten applications in 2012. *Id.* at 164-267. Although Stragapede continued to receive emails about available jobs in 2013,

he did not present evidence that he submitted any more applications. *See id.* at 269-341. At trial, Stragapede's wife, Geanine, testified that Stragapede stopped looking for work in 2013. Stragapede also testified that he stopped looking for work aggressively in 2012, though he still sometimes looks online for jobs. Apart for a handful of temporary jobs, Stragapede has been unable to find work. Stragapede and his wife both believe, however, that he is capable of working despite his disability. Stragapede is also capable of learning new things, and he has developed new ways to cope with any memory or cognitive deficits that remain. Because Stragapede was unable to find full-time work, he and his wife have been paying their health-insurance costs out of pocket. *See* Pl.'s Exh. 5, COBRA Payments; Pl.'s Exh. 6, Insurance Payments; Pl.'s Exh. 7, Medicare Payments; Pl.'s Exh. 21, Insurance Cost Summary.

## II. Legal Standard

The ADA incorporates the remedies for employment discrimination provided by Title VII of the Civil Rights Act. 42 U.S.C. § 12117(a) (adopting, among other provisions, 42 U.S.C. § 2000e-5(g)(1)). Under Title VII, once a district court has found that an employer has intentionally engaged in an unlawful employment practice can order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). If reinstatement is inappropriate, a court can award front pay to a victim of employment discrimination. *Williams v. Pharmacia*, 137 F.3d 944, 952 (7th Cir. 1998) ("As the equivalent of reinstatement, front pay falls squarely within the statutory language

4

[of § 2000e-5(g)(1)] authorizing 'any other equitable relief.'"). Because they are equitable remedies, any award of back pay and front pay is to be decided by the court. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole."); *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499-501 (7th Cir. 2000) ("Back pay and front pay are equitable remedies … and therefore matters for the judge."); *Williams*, 324 F.3d at 951-52 (approving of a district court's conclusion that front pay is an equitable remedy and a matter for the court to decide). "The district court has broad equitable discretion to fashion back pay awards to make the [discrimination] victim whole." *David*, 324 F.3d at 865.

### III. Back Pay

Once the jury has found that there has been employment discrimination, there is a presumption that the employee is entitled to an award of back pay. *See David*, 324 F.3d at 865; *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 817-18 (7th Cir. 1990). The claimant must establish the amount of damages, but he is presumptively entitled to full relief. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994); *Gurnee Inn*, 914 F.2d at 817-18; *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847-48 (2001) (holding that back pay includes lost benefits); *EEOC v. O'Grady*, 857 F.2d 383, 391 (7th Cir. 1988) (same). "Once a plaintiff has established the amount of damages [he] claims resulted from [his] employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the

plaintiff asserts." *Hutchison*, 42 F.3d at 1044; *accord Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) (holding that it is "[n]ot until the plaintiff establishes what she contends are her damages [that] the burden of going forward to rebut the damage claim or to show plaintiff's failure to mitigate damages, fall on defendant").

In the damages phase of this case, Stragapede presented evidence of his rate of pay, hours worked, and the amount of benefits he would have received. *See, e.g.,* Pl.'s Exh. 3, Stragapede Tax Forms; Pl.'s Exh. 6, Insurance Payments; R. 25, Calculation of Front and Back Pay. The City of Evanston stipulated that Stragapede's proffered rates of pay were correct, that his exhibits were authentic, and that his mathematical calculations were accurate. Proposed Pre-Hrg. Order at 2-3. Evanston does not dispute the *amount* of damages that Stragapede would receive if he were to be awarded back pay; instead, it disputes Stragapede's *entitlement* to a back-pay award. Because the City's defenses affect whether Stragapede is entitled to back pay at all, those defenses will be addressed first. The Court will then turn to the calculation of any back-pay award to which Stragapede is entitled.

### A. Defenses

The City raises three arguments to rebut Stragapede's entitlement to back pay. First, it argues that Stragapede is not entitled to back pay because he failed to mitigate his damages. Def.'s Post-Hrg. Resp. Br. at 3-6. Next, the City argues that Stragapede's Social Security Disability Insurance (SSDI) payments and

unemployment benefits must be offset from any back-pay award. *Id.* at 6-7. Finally, the City argues that Stragapede's interim earnings must be deducted from any back-pay award. *Id.* The Court will address each argument in turn.

### 1. Failure to Mitigate

Evanston argues that Stragapede's back-pay award must be limited to the period between September 24, 2010, the date he was fired, and January 1, 2013, when he stopped looking for work. Def.'s Post-Hrg. Resp. Br. at 2-6. Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989) (internal quotation marks and emphasis omitted). Any back-pay award to a victim of discrimination must therefore be reduced by "amounts earnable [by the employee] with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1). Although the duty to mitigate falls on the plaintiff, *see Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982), it is the defendant's burden to establish that the plaintiff failed to mitigate his damages, *see Hutchison*, 42 F.3d at 1044. "To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendant[ ] must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Id.*; *accord Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986) (stating that a defendant must "prove both that the employee was not reasonably diligent in

seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance the employee might have found comparable employment").

A plaintiff who was wrongfully discharged "must mitigate damages by using reasonable diligence in finding other *suitable employment*." *Graefenhain*, 870 F.2d at 1202 (internal quotation marks omitted). He "need not go into another line of work, accept a demotion, or take a demeaning position," *id.*, but a plaintiff "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment," *Hutchison*, 42 F.3d at 1044. Nor will a lack of success excuse the plaintiff from his duty to mitigate. A plaintiff's "discouragement [may be] understandable, and his lack of success [may be] regrettable, but his duty to mitigate [does] not evaporate in the face of his difficulties." *Payne v. Security Saving and Loan Assoc.*, 924 F.2d 109, 111 (7th Cir. 1991).

Evanston concedes that Stragapede diligently looked for employment for over a year after he was fired. *See* Def.'s Post-Hrg. Resp. Br. at 2-6 (arguing that back pay should be cut off on January 1, 2013). He submitted dozens of job applications and was able to get some temporary work. Pl.'s Exh. 10, Stragapede Applications; Pl.'s Exh. 11, 2012 W-2; Pl.'s Exh. 12, 2011 W-2; Pl.'s Exh. 18, Chicago Mini Bus Checks. But, the Court finds, Stragapede and his wife essentially conceded that he stopped seriously looking for work after 2012. At the evidentiary hearing, Stragapede testified that he still looked online for jobs online and touched base with friends and his sister about potential employment after 2013. But given the trial testimony that he stopped aggressively looking for work coupled with the absence of

any job applications after 2013, the Court does not find this testimony to be sufficient evidence of a diligent job search. Based on the evidence in the record, Evanston has demonstrated that Stragapede failed to exercise reasonable diligence from January 1, 2013 onward.

Although the City has shown that Stragapede was not reasonably diligent in his job search after 2012, it has offered no evidence whatsoever to satisfy the second requirement of the mitigation defense: that "there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." *Hutchison*, 42 F.3d at 1044. Evanston does not claim that it presented such evidence; it argues that it did not have to. Def.'s Post-Hrg. Resp. Br. at 6. In support of this argument, Evanston cites to *Greenway v. Buffalo Hilton Hotel*, which adopted a rule that an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." 143 F.3d 47, 54 (2d Cir. 1998) (citing *Weaver v. Casa Gallardo*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)). "The underlying rationale is that an employer should not be saddled by a requirement that *it* show other suitable employment in fact existed … when the employee, who is capable of finding replacement work, failed to pursue employment at all." *Id.* Because Stragapede was not reasonably diligent in finding employment from 2013 onward, Evanston argues, the City does not have to demonstrate that there was a reasonable likelihood that he would have found comparable work. Def.'s Post-Hrg. Resp. Br. at 6.

But the Seventh Circuit has not adopted this rule. In fact, the Seventh Circuit emphasizes that the employer "must prove *both* that the claimants were not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that the claimants might have found comparable employment." *Gurnee Inn*, 914 F.2d at 818 (internal alterations and quotation marks omitted) (emphasis in original); *see also United States v. City of Chicago*, 853 F.2d 572, 578 (7th Cir. 1988); *Wheeler*, 794 F.2d at 1234. And the Seventh Circuit has also rejected a mitigation defense when the employer fails to demonstrate that the claimants might have found comparable work. *Gurnee Inn*, 914 F.3d at 818-19 ("We agree with the district court that, because Gurnee failed to establish that there was a reasonable chance the claimants could have found comparable employment, the defendant failed to sustain its burden of proof."). The reasoning behind the requirement that the employer demonstrate the existence of available work makes sense: an employee might stop looking for work if none is available, and under that circumstance, the plaintiff's decision to stop looking would itself be reasonable. Ultimately, failure to mitigate is an affirmative defense, and the burden rightfully rests on the defense. *Id.* at 818 ("We emphasize that the employer bears the burden of proving a failure to mitigate."). Evanston was required to prove that there was a reasonable chance that Stragapede might have found comparable employment, and it failed to carry its burden. Stragapede's back-pay award will not be reduced for failure to mitigate.

10

### 2. Collateral Source Payments

Stragapede concedes that he received $113,507 in SSDI benefits and $22,517 in unemployment benefits between his discharge in September 2010 and the date of trial. Proposed Pre-Hrg. Order at 2-3. Evanston argues that these payments must be offset from any back-pay award. Def.'s Post-Hrg. Resp. Br. at 6-7. Stragapede responds that these payments are from a collateral source and therefore should not be subtracted from back pay. Pl.'s Post-Hrg. Reply Br. at 9-10.

"The purpose of the collateral source rule is not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice." *O'Grady*, 857 F.2d at 389 (quoting *Perry v. Larson*, 794 F.2d 279, 286 (7th Cir. 1989)). The rule therefore "focuses on what the tortfeasor should pay, not on what the plaintiff should receive." *Id.* at 390. In *O'Grady*, a case arising under the ADEA, the Seventh Circuit concluded that pension benefits should not be offset because (1) they were "earned by the claimants and therefore not paid by the employer at all," and (2) the payments "were made to carry out a state policy under state law independent of [back-pay] awards," and the employer "was only one contributor to the fund." *Id.* at 391. The employer would have had to contribute to the pension fund even if it had not wrongfully fired its employees. To allow it to recoup these payments would give the employer a "discrimination bonus" by allowing it "to pay less than it would have paid had it acted lawfully." *Id.* ("But as between conferring a windfall on claimants or defendants, claimants are the logical choice. The district court's refusal to offset was not an abuse of discretion."). Whether to deduct

collateral-source payments from a back-pay award is ordinarily at the discretion of the district court. *Id.*; *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 756 (7th Cir. 1983); *accord Garon v. Miller Container Corp.*, 2007 WL 158726, at *1 (C.D. Ill. Jan. 18, 2007); *Tomao v. Abbott Labs., Inc.*, 2007 WL 141909, at *3 (N.D. Ill. Jan. 16, 2007).

Unemployment benefits are subject to the collateral source rule for employment-discrimination cases. *See NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364 (1951); *O'Grady*, 857 F.2d at 389 ("[T]he Supreme Court has held that unemployment benefits are subject to the collateral source rule under the same back pay recovery provisions at issue here." (citing *Gullett Gin*, 340 U.S. at 364)). Unemployment benefits are paid "by the state out of state funds derived from taxation." *Gullett Gin*, 340 U.S. at 340. Although the employer paid taxes which funded the state's unemployment benefits, those payments were "not made to discharge any liability or obligation of [the employer], but to carry out a policy of social betterment for the benefit of the entire state." *Id.*; *see also U.S. Can Co. v. NLRB*, 254 F.3d 626, 631-32 (7th Cir. 2001) (contrasting unemployment benefits, "whose level and eligibility criteria are out of the employer's hands," with severance benefits, which came from the employer directly and "inure[d] solely to the benefit of" the employer's employees). Evanston argues that, because it did not contest Stragapede's claim for unemployment benefits, those benefits should be offset from the back-pay award. Def.'s Post-Hrg. Resp. Br. at 7. But the City does not explain how their failure to contest the benefits justifies the "discrimination bonus" that

12

offsetting these payments would provide. The City paid taxes to partially fund unemployment benefits to effect the State's policy of social betterment; it would have had to pay unemployment taxes whether or not it had acted unlawfully. *See O'Grady*, 857 F.2d at 391. To allow the City to now offset these benefits would be a windfall to the City, and "as between conferring a windfall on claimants or defendants, claimants are the logical choice." *Id.* Stragapede's unemployment benefits will not be offset from his back-pay award.

Evanston raises two issues with Stragapede's SSDI benefits. First, it argues that Stragapede's receipt of SSDI benefits undermines his entitlement to back pay altogether. Def.'s Post-Hrg. Resp. Br. at 11-13. To fully understand this argument, it is important to understand the relationship between claims under the ADA and SSDI. As discussed at length during the summary-judgment phase of this case, the receipt of SSDI payments is not automatically in conflict with an ADA claim. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999). These claims can coexist because the legal standards under the statutes differ. *Id.*; *see also Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir. 1999). If the plaintiff's sworn prior statements in his SSDI application contradict his ADA claims, however, "the court should require an explanation of any apparent inconsistency." *Cleveland*, 526 U.S. at 807. But an explanation is only required if an inconsistency exists. *Id.* at 806. In this case, Stragapede's SSDI application materials were not produced in discovery. Because Evanston presented only the bare fact that Stragapede was receiving SSDI benefits, the Court denied summary judgment in favor of the City

13

because receipt of benefits and an ADA claim are not necessarily mutually exclusive. R. 70, Order on Mot. Summ. J. at 18-19. After the denial of summary judgment, Evanston asked the Court to compel production of the SSDI documents and to reconsider its opinion. R. 71, Mot. Alter Judgment at 10. The Court refused; discovery was long, long closed and the parties had been warned to raise any discovery disputes with the Court during the discovery period. R. 73, Oct. 17, 2014 Minute Entry. The City also tried to subpoena the Social Security Administration to produce the documents. R. 79, Mot. Quash. The Court quashed this subpoena as a form of improper, too-late discovery. R. 84, Dec. 9, 2014 Minute Entry. The City again tried to raise the SSDI issue at trial, but the Court barred questioning on the SSDI application based on a concern that the fishing expedition would be a waste of time (not to mention confusing to the jury, because of the different legal settings) under Federal Rule of Evidence 403. R. 103, Feb. 17, 2015 Pretrial Order at 3-4. As the many discussions on this issue demonstrate, the City's failure to diligently pursue the SSDI application materials in discovery ended-up blocking the argument that the SSDI benefits are inconsistent with its liability under the ADA.[3]

But the City is correct that SSDI applications can have relevance beyond the issue of liability. The Seventh Circuit considered the interaction between SSDI

---

[3]The City says that it is not attempting to revisit prior arguments about the SSDI benefits, but it cites to several cases addressing the intersection of SSDI benefits and ADA liability. Def.'s Pre-Hrg. Br. at 2-3 (citing *Opsteen v. Keller Structures*, 408 F.3d 390, 391-92 (7th Cir. 2005); *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891-91 (7th Cir. 2005); *Lee v. City of Salem*, 259 F.3d 667, 676-77 (7th Cir. 2001); *Feldman*, 196 F.3d at 790-91). Because of the jury finding of liability, and question as to interaction between the SSDI benefits and liability is now closed.

benefits and back-pay awards in *Flowers v. Komatsu Mining Systems, Inc.*,[4] 165 F.3d 554, 557-58 (7th Cir. 1999) (noting that the effect of SSDI benefits on an ADA claim "ordinarily arises during the liability phase of a trial"). In *Flowers*, the court determined that receipt of SSDI benefits could suggest that there were periods in which a plaintiff could not work (and therefore would not have received pay at all). *Id.* If there were times during the back-pay period in which the discharged employee could not work at all due to his disability (with or without an accommodation), the reviewing court must excise those periods from the back-pay award. *Id.* "The court can consider statements made on the applications for benefits and doctors' representations in support of the applications, keeping in mind that the ultimate issue is whether during the relevant period of time for which back pay is sought [the employee] could have performed his duties [for the employer], with or without an accommodation." *Id.* at 558.

So, as with liability, it is the *statements* in the SSDI application that are at issue in evaluating its effect on the back-pay award. Although the Court did not authorize post-trial discovery on the SSDI applications themselves in the damages phase of trial, the Court did allow Evanston to ask Stragapede about qualifying for SSDI benefits (including having to undergo medical examinations for eligibility of benefits); the Court explained, during the hearing, that the Rule 403 concern was diminished at the non-jury hearing. Despite being permitted to cross-examine on

---

[4]*Flowers* was decided before the Supreme Court's decision *Cleveland v. Policy Management Systems*, which held that SSDI benefits and ADA claims do not automatically conflict. But *Flowers* correctly stated that the receipt of SSDI benefits does not automatically preclude a suit under the ADA, just that the SSDI materials must be considered. 165 F.3d at 557.

the issue, Evanston did not actually follow through and ask Stragapede about the substance of his application or representations made by his doctors in connection with applying for benefits. There is no evidence of the content of the SSDI application in the record, and therefore no basis on which to conclude that there were periods during which Stragapede could not work, with or without an accommodation, during the back-pay period.

Evanston's second argument is that, like unemployment benefits sometimes are, Stragapede's SSDI benefits should be offset from any back-pay award. As with other collateral payments, it is within a court's discretion to offset SSDI payments from a back-pay award. *Flowers*, 165 F.3d at 558. Like unemployment benefits, SSDI is funded by both the employee and the employer through taxes. *See Schuster v. Shepard Chevrolet, Inc.*, 2002 WL 507130, at *6-7 (N.D. Ill. Apr. 3, 2002). These payments, which would be made regardless of whether the City acted wrongfully, are part of a program to promote society's welfare across-the-board. Again, offsetting SSDI benefits would confer a "discrimination bonus" on Evanston. Stragapede's SSDI payments will therefore not be reduced by the amount that he received from the Social Security Administration.

### 3. Interim Earnings

Under the remedy provisions of Title VII (adopted by the ADA), any "[i]nterim earnings … shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Interim earnings are "wages (or the like) earned by a discriminated upon employee in the period after his discharge but before judgment

16

that, but for the discrimination, would not have been earned." *Chesser v. State of Ill.*, 895 F.2d 330, 337 (7th Cir. 1990). The City of Evanston argues Stragapede's interim earnings must be offset from his back-pay award. Def.'s Post-Hrg. Resp. Br. at 6-7. It is the City's burden to demonstrate that the "damages were in fact less than the plaintiff asserts." *Hutchison*, 42 F.3d at 1044.

The City points to evidence in the record of wages that Stragapede earned during the back-pay period. In 2011, Stragapede's W-2 tax statements show that he earned $14,071.91 from MV Public Transportation, Inc. Pl.'s Exh. 12, 2011 W-2. In 2012, Stragapede's W-2 tax statements show that he earned $3,948.74 from Chicago Meat Authority, Inc. and $2,230.81 from Careers and Employment Services. Pl.'s Exh. 11, 2012 W-2. Stragapede also received cashier's checks from Chicago Mini Bus Travel, Inc.; the checks were for $723.25 and $374.00. Pl.'s Exh. 18, Chicago Mini Bus Checks. At the evidentiary hearing, Stragapede conceded that these payments were wages for work done in 2012. Based on this uncontroverted evidence, Stragapede's interim earnings in 2011 and 2012 were $21,348.71. This amount must be offset from any award of back pay. 42 U.S.C. § 2000e-5(g)(1).

The City also argues that an additional $1,000 in interim earnings from Chicago Mini Bus must be offset from Stragapede's back-pay award. Def.'s Post-Hrg. Resp. Br. at 7. At the evidentiary hearing, Stragapede testified that he had worked for Chicago Mini Bus in 2013, and that he had been paid by cashier's check. Stragapede did not present any tax returns or other evidence of the amount of these payments, and he testified that he could not recall the precise amount that he was

paid. When questioned about the 2013 earnings, Stragapede said that the amount he earned in 2012 was comparable to what he received in 2013. But when the City asked him if that meant that he had earned roughly $1,000 from Chicago Mini Bus in 2013, Stragapede denied that he had made that much, saying that he had only worked for Chicago Mini Bus for a week in 2013. Despite these contradictory answers, the City did not question Stragapede any further on how much Stragapede would have been paid for a week of work at Chicago Mini Bus.[5] Because Evanston failed to demonstrate with any reasonable certainty the wages that Stragapede earned from Chicago Mini Bus in 2013, this amount will not be deducted from Stragapede's back-pay award. The total amount of interim earnings to be offset is $21,348.71.

## B. Calculating the Back Pay Award

Because the City did not show that Stragapede failed to mitigate damages, Stragapede is entitled to back pay from the date of his termination, September 28, 2010, through the date of judgment. *See Hutchison*, 42 F.3d at 1047. An award of back pay is meant to make victims of discrimination whole and return them to the position they would have been in absent the discrimination. *See, e.g., David*, 324 F.3d at 865. To that end, an award of back pay generally includes lost wages, bonuses, benefits, and other forms of compensation that a plaintiff would have earned if he had not been wrongfully fired. *See, e.g., Kao v. Sara Lee Corp.*, 1997 WL

---

[5]For example, the City could have asked Stragapede how many weeks he worked in 2012 to attempt to extrapolate the rate of pay for a week of work. Or, better yet, during the discovery period, the City could have subpoenaed all of Stragapede's employers for payroll records.

106255, at *8 (N.D. Ill. Feb. 13, 1997) (citing *Kossman*, 849 F.2d 1027, 1032 (7th Cir. 1988)). Each component of the back-pay award will be discussed in turn.

### 1. Wages

Stragapede presented unrebutted evidence of his rate of pay and the raises he could expect to receive over the course of the back-pay period. Pl.'s Exh. 1, 2008 Paystubs; Pl.'s Exh. 2, 2009 Paystubs; Pl.'s Exh. 3, Stragapede Tax Forms; Pl.'s Exh. 9, Union Contract. Evanston does not contest these figures, and it stipulated to the calculations in Stragapede's summary of his back-pay and prejudgment-interest calculations. Pl.'s Exh. 25, Summary of Back and Front Pay at 2. Based on these calculations, Stragapede is entitled to $271,546.11 in wages for the back-pay period and $22,294.60 in prejudgment interest on that amount,[6] for a total of $293,840.71. *Id.*; *see also* R. 147, Pl.'s Exh. A, Damages Summary.

### 2. Overtime

Because the purpose of back pay is to put the plaintiff in the position he would have been in absent discrimination, *see Albemarle Paper Co. v.Moody*, 422 U.S. 405, 418-19 (1975), lost overtime can be included in a back-pay award, *see, e.g., Bruso v. United Airlines, Inc.*, 239 F.3d 848, 856-57 (7th Cir. 2001); *Kossman v.*

---

[6]Prejudgment interest is presumptively available for violations of federal law. *See Shott v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003). Stragapede only requested prejudgment interest for his award of lost wages, so the Court will only award prejudgment interest on that amount. There does seem to be a calculation error in Stragapede's exhibits. His summary of back pay incorrectly totals his prejudgment interest at $22,144.65, but the amounts in the preceding columns actually add up to $22,294.60. Pl.'s Exh. 25, Summary of Back and Front Pay at 2. The calculation of his adjusted annual salary plus prejudgment interest reflects the correct total according to his earlier calculations (or nearly; it is two cents short). *Id.* The damages summary, Pl.'s Exh. A, reflects the same addition error.

*Calumet Cnty.*, 800 F.2d 697, 703 (7th Cir. 1986), *overruled on other grounds by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir. 1988); *United States v. City of Warren*, 138 F.3d 1083, 1097 (6th Cir. 1998). Stragapede presented evidence of the typical amount of overtime he worked, *see* Pl.'s Exh. 1, 2008 Paystubs; Pl.'s Exh. 2, 2009 Paystubs, Pl.'s Exh. 3, Stragapede Tax Forms; Pl.'s Exh. 22, Overtime Summary, and he credibly testified that he enjoyed working overtime and would have continued to do so if he had not been fired. Based on the amount of overtime he had worked in the past, Stragapede estimates that he would have worked roughly 128.15 hours of overtime at 1.5 times his pay rate and 31.5 hours of overtime at 2 times his pay rate. Pl.'s Exh. 22, Overtime Summary. According to Stragapede, this would amount to an additional $6,952.32 in compensation.[7] Pl.'s Exh. A, Damages Summary. Evanston has stipulated to the accuracy of Stragapede's calculations and does not challenge his entitlement to these damages beyond the defenses rejected above. Stragapede is therefore entitled to $6,952.32 in overtime wages from the date of his termination to the date of the jury's verdict.

### 3. Healthcare Costs

Stragapede has presented evidence that he paid $50,954.03 in out-of-pocket healthcare costs between the time he was terminated and the date of trial.[8] *See* Pl.'s Exh. 5, COBRA Payments; Pl.'s Exh. 6, Insurance Payments; Pl.'s Exh. 7, Medicare Payments; Pl.'s Exh. 21, Insurance Cost Summary. Evanston has stipulated to the

---

[7]Stragapede does not explain how he arrived at this figure, but the City does not dispute this amount. *See generally* Def.'s Post-Hrg. Resp. Br. (failing to discuss overtime).

[8]Stragapede's exhibits appear to be missing premium notices or receipts for certain months, but because Evanston does not dispute the damages calculation in Plaintiff's Exhibit 21, the Court will use the agreed figures.

accuracy of Stragapede's calculations and does not challenge his entitlement to these damages beyond the defenses rejected above. Stragapede is therefore entitled to $50,954.03 in out-of-pocket insurance costs.

### 4. Pension Benefits

In his presentation of evidence, Stragapede only presented evidence of the value that his pension would have if he had worked until he was 55 or 60 years old.[9] *See* Pl.'s Exh. A, Damages Summary; Pl's Exh. 20, Pension Summary. He did not provide a year-by-year breakdown of this information or distinguish between the employee's contribution (from his wages) and the employer's contribution; he simply gave a lump sum representing the entire future value of his pension if he were to work until a particular age and collect his pension benefits for another twenty years. *See* Pl.'s Exh. A, Damages Summary; Pl's Exh. 20, Pension Summary. As discussed below, Stragapede is not entitled to front pay. So this cumulative figure is of little use in determining the amount in pension benefits that Stragapede is entitled to as part of his damage award.

It is Stragapede's responsibility to demonstrate the amount the amount in damages the claims resulted from Evanston's conduct. *Hutchison*, 42 F.3d at 1044. There is no question that certain elements of his pension are compensable. At a minimum, Stragapede would have received the employer contributions to his

---

[9]In addition to pension benefits, Stragapede initially requested contributions into a voluntary deferred-compensation plan as an element of back-pay damages. *See* Pl.'s Pre-Hrg. Br. at 7. The Court asked the parties to address Stragapede's entitlement to these damages in their post-hearing briefs. Stragapede did not do so; nor did he include the voluntary plan in his damages summary. *See* Pl.'s Exh. A. Stragapede has therefore withdrawn his claim to these damages, and they shall not be awarded.

pension and the interest generated on both his own and Evanston's contributions had he not been wrongfully fired. The question, then, is whether Stragapede has provided sufficient information to determine the amount he is owed for the back-pay period.

Stragapede has provided no information about the interest rate or investment return-rate that he would have received for contributions to his pension. He has thus failed to show his entitlement to those damages. But Stragapede's exhibits do show the principal amount in employer contributions to his pension that he could have expected to receive had he continued to work at the City. The Illinois Municipal Retirement Fund (IMRF) documents state that, while Stragapede was employed by the City of Evanston, he was to pay 4.5% of his annual salary to his pension fund. *See* Pl.'s Exh. 15, IMRF Statements at 5, 12 ("As a member of IMRF, you are making contributions toward a Regular plan pension. For your Regular plan, you contribute 4.5% of your salary."). The yearly salary for the purposes of the IMRF plan included overtime pay. *Compare id.* at 6 (showing 2008 monthly wages and contributions), *with* Pl.'s Exh. 1, 2008 Paystubs at 24 (showing roughly the same amount as Stragapede's year-to-date pay for 2008, which included overtime pay). The City contributed between 8.5% and 11.79% of Stragapede's salary, which included overtime, to the deferred compensation plan. Proposed Pre-Hrg. Order at 3 ("During the years 2009-2015, the City paid between 8.5% to 11.79% on behalf of eligible City employees to the Illinois Municipal Retirement Fund.").

Evanston stipulated to the amount of Stragapede's salary and estimated overtime for the back-pay period; he would have earned $271,546.11 in wages and $6,952.32 in overtime if not for his wrongful termination.[10] If not for his wrongful termination, Stragapede would have continued to pay 4.5% of this amount into his pension plan, and the City of Evanston would have contributed at least 8.5%. Stragapede did not receive the contributions from the City as a result of his termination.[11] He is therefore entitled to the $23,672.37[12] that he would have received in matching pension contributions from the City.

### 5. Total Award

Based on the above calculations, Stragapede has shown that he is entitled to $293,840.71 in wages (including prejudgment interest), $6,952.32 in overtime, $50,954.03 in healthcare costs, and $23,672.37 in pension contributions, for a total of $375,419.43. This amount must be reduced by Stragapede's $21,348.71 in interim earnings. Stragapede's total back-pay award is therefore $354,070.72. Stragapede is entitled to post-judgment interest on this amount. 28 U.S.C. § 1961.

### IV. Front Pay

Where reinstatement is inappropriate,[13] "[a]n award of front pay compensates an unlawfully discharged employee for the loss of earnings that he sustains as a result of the discharge." *Mattenson v. Baxter Healthcare Corp.*, 438

---

[10]For a total of $278,498.43.

[11]Stragapede did not present evidence of which contribution rate applied at which time. So, although he presented evidence that he is entitled to at least 8.5% contribution, he has not sufficiently shown that he is entitled a higher percentage for any particular year.

[12]That is 8.5% of $278,498.43.

[13]The parties agree that reinstatement is not appropriate in this case. *See* Proposed Pre-Hrg. Order at 3.

F.3d 763, 771 (7th Cir. 2006). Front pay is "the discounted present value of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment." *Williams*, 137 F.3d at 953 (internal alterations omitted). The award "must be grounded in available facts, acceptable to a reasonable person[,] and not highly speculative." *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994). A front pay award is therefore often limited in duration; it is awarded for "a reasonable period of time, until a date by which the plaintiff, using reasonable diligence, should have found comparable employment." *Williams*, 137 F.3d at 954 (quoting *Ward v. Tipton Cnty. Sheriff Dept.*, 937 F. Supp. 791, 796 (S.D. Ind. 1996)); *see also Biondo v. City of Chicago*, 382 F.3d 680, 691 (7th Cir. 2004) ("Front pay cannot extend past the time a reasonable person needs to achieve the same or an equivalent position in the absence of discrimination."); *Hutchison*, 42 F.3d at 1075 (holding that a denial of front pay was reasonable when the jury "may reasonably have set a date between termination and judgment by which [the employee], using reasonable diligence, should have found 'comparable' employment"). So, "[t]he familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for comparable employment." *Mattenson*, 438 F.3d at 771 (noting that it is the employee's responsibility to "present persuasive evidence of inability to find a substitute job").

Stragapede, who is now 52 years old, asks for a front-pay award through the day he would have retired from the City, either at age 60 or 65. Pl.'s Exh. A, Damages Summary. He does present some constituent facts that suggest he would have worked for Evanston until retirement—after all, he had worked for the City for more than fourteen years when he was fired. But Stragapede's front-pay award can only extend until Stragapede, using reasonable diligence, should have found comparable employment. *Biondo*, 382 F.3d at 691. He was not diligent here after 2012. Both Stragapede and his wife believe that he is capable of working at jobs similar to the one he had at the City of Evanston, and he has found new approaches to learning new things that help him overcome his memory and cognitive deficits. Stragapede can work, but he stopped seriously looking for work in 2013. Stragapede has been out of work for nearly five years. Although he was understandably frustrated with his lack of success in his first few years of looking for new jobs, that does not mean that he can stop trying and expect an award of front pay through his intended retirement age. Had Stragapede continued to diligently search for work, he might very well have found comparable employment. His claim for front pay is denied.

Stragapede's front-pay claim must also be denied for another reason: he failed to provide the Court with the appropriate discount rate. "[W]hen a party fails to provide the district court with the essential data necessary to calculate a reasonably certain front pay award, the court may deny the front pay request." *McKnight v. General Motors*, 973 F.2d 1366, 1372 (7th Cir. 1992). "Such information

includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." *Id.*; *accord Bruso*, 239 F.3d at 862. "If the plaintiff fails to provide this information to the district court, the court will not abuse its discretion if it denies his request for front pay." *Bruso*, 239 F.3d at 862.

Here, Stragapede provides no discount rate for his front-pay calculation. Although it might seem like a technical requirement, the failure to provide the discount rate is grounds for refusing to award front pay. *See, e.g., Gedmin v. North American Safety*, 2010 WL 4539447, at *2-3 (N.D. Ill. Nov. 3, 2010) (denying an award of front pay for, among other things, failing to supply the discount rate); *O'Sullivan v. City of Chicago*, 2007 WL 951941, at *10 (N.D. Ill. Mar. 26, 2007) ("[T]he request [for front pay] nonetheless cannot be granted, because the Motion fails to provide the discount rate necessary to establish the proper amount of the total award."). This should not be a surprise to Stragapede, as front pay is defined as "the *discounted present value* of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis, inferior employment." *Williams*, 137 F.3d at 953 (internal alterations omitted) (emphasis added). The City also alerted Stragapede to the deficiency in his calculations in its prehearing brief, Def.'s Pre-Hrg. Br. at 10 ("Plaintiff failed to present competent evidence of the applicable discount rate, which is a necessary prerequisite for a front pay claim."), but Stragapede failed to amend his calculations to account for the present-value of

the proposed award, *see, e.g.,* Pl.'s Exh. A, Damages Summary.[14] Stragapede failed to provide the Court with the information necessary to calculate a reasonable front-pay award, and the claim for front-pay is denied.

## V. Conclusion

For the reasons discussed above, Stragapede is entitled to an award of $354,070.72 in back pay, encompassing lost wages, overtime, and benefits. This amount is subject to post-judgment interest as provided by 28 U.S.C. § 1961. Stragapede is not entitled to any award of front pay. A final judgment shall be entered in the total amount of damages, which includes compensatory damages awarded by the jury, of $579,070.72.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 28, 2015

---

[14]Stragapede argues that, because Evanston stipulated to its calculations, it should not be allowed to raise the failure to provide the discount rate. Pl.'s Post-Hrg. Reply Br. at 11. But Evanston stipulated to Stragapede's math and rates of pay, not his *entitlement* to the amount of damages Stragapede set forth. Stragapede's waiver argument also fails. For one, the City did raise the discount-rate issue in its opening brief. Def.'s Pre-Hrg. Br. at 10. But more importantly, it is Stragapede's burden to show that he is entitled to front pay, and it is his responsibility to give the Court the information it needs to make that calculation. *Bruso*, 239 F.3d at 862. Evanston is not "now present[ing] evidence that could have been presented" before, Pl.'s Post-Hrg. Reply Br. at 11; it is making a legal argument based on the sufficiency of Stragapede's factual showing.