| | | |
|---|---|---|
| BIAGIO STRAGAPEDE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 08879 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF EVANSTON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On March 13, 2015, after a week-long trial, the jury returned a verdict for Plaintiff Biagio "Gino" Stragapede, finding that Defendant City of Evanston (the City) fired him on the basis of his disability in violation of the Americans with Disabilities Act. R. 127, 3/13/15 Minute Entry.[1] *Id.* The jury also awarded Stragapede $225,000 in compensatory damages for past and future emotional pain and suffering. *Id.* The issue of equitable remedies—front pay and back pay—was reserved for this Court, which later held that Stragapede was entitled to $354,070.72 in back pay plus post-judgment interest, but no front pay. R. 151, Equitable Remedies Order. The Court entered judgment on August 28, 2015. R. 152, Judgment. The City now moves for (1) a new trial under Rule 59, R. 155; (2) judgment a matter of law under Rule 50(b), R. 159; and (3) remittitur and amendment of the judgment under Rule 59(e), R. 157. For the reasons explained below, all of the City's motions are denied.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

# I. Motion for a New Trial

The City moves for a new trial under Rule 59, which can only be granted "if the jury's 'verdict is against the manifest weight of the evidence, ... or if for other reasons the trial was not fair to the moving party.'" *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)). "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). But even with the trial court's authority to assess credibility, the new-trial standard is tough to satisfy, because generally "the district court is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Id.* at 633 (quotation omitted).

## A. Essential Functions

The City first argues that Stragapede failed to prove that he was qualified to perform the essential functions of his job, R. 180, Def.'s New Trial Br. at 3-6, a burden that the plaintiff bears in proving an ADA claim. *See Basden v. Professional Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Essential functions are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n). EEOC regulations instruct that:

> Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are

essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Id.* At trial, Stragapede and others testified that key responsibilities of a water service worker included, among other things, installing water meters, troubleshooting high water bills, conducting JULIE locates, working with B-boxes, taking water samples, driving to various sites, and using maps and applications on the computer. Trial Tr. 198:9-14, 700:15-724:21.[2] These responsibilities were also listed on the City's water service worker job description. Def.'s Trial Exh. 2, City of Evanston Classification Standard. Given these duties, the trial testimony did establish, generally speaking, that a water service worker is a field position that requires independent work. Trial Tr. 208:20-209:1, 492:8-10, 935:25-936:16. The City argues that the evidence at trial establishes that Stragapede could not perform these tasks because (1) he needed constant assistance with his computer login and password, *id.* 895-97; (2) Dr. Zoran Grujic, a physician whom the City hired to examine Stragapede, identified work performance deficiencies, *id.* 799:1-10; and (3) Stragapede was repeatedly counseled by his supervisors regarding his ongoing failure to remain in the field and do his job, *id.* 505:5-20. Def.'s New Trial Br. at 3-6.

---

[2]Both parties provided the trial transcript, divided into several docket entries, as exhibits to their briefs. *See* R. 181, Def.'s Exhs. A-J; R. 186-87, Pl.'s Exhs. 1-2. For simplicity, the Court cites only to the page number of the transcript and not to the specific docket entry or exhibit.

Contrary to the City's argument, however, there was more than enough evidence for the jury to conclude that Stragapede was able to perform his core responsibilities. Specifically, Tim Bartus, Stragapede's direct supervisor, testified that after returning from medical leave, "[Stragapede] was capable of doing a perfect install on meters in 2010." Trial Tr. 478:17-19. Bartus performed three to four spot checks on Stragapede's JULIE work, and each was accurate. *Id.* 476:15-17. And during the time between returning to work in June 2010 and being fired in September 2010, no one ever told Stragapede that he was not completing his daily duties appropriately. *Id.* 757:20-24. Vicki Biner, the Meter Service Coordinator, testified that "[w]hen Gino returned to work in 2010, he could do the job … ." *Id.* 859:8-10. She also explained that Stragapede's worksheets—which he had to complete at the end of each day—were accurate and complete "most of the time," and that she never noted any problems with his worksheets. *Id.* 845:19-846:3.

As to the computer difficulties, Stragapede admitted that his short-term memory problems caused by his brain injury sometimes led him to forget his login credentials. *Id.* 735:22-24. But Biner testified that during the month between June 2 and July 2, 2010, Stragapede only requested computer assistance "three to four times." *Id.* 898:3-13; *see also id.* 895:11-898:13 (testifying to the computer issues when Stragapede returned to work); *id.* 573:3-4 (explaining that Stragapede returned to work on June 2); *id.* 608:19-23 (explaining that Stragapede was put on administrative leave on July 2). Biner suggested that Stragapede keep a sticky note with his login credentials by his computer. *Id.* 896:10-18. This strategy, as well as

calling Biner for assistance from the field, helped Stragapede successfully log in, after which he had no additional computer issues. *Id.* 352:17-19, 831:23-832:9. In fact, both Biner and David Stoneback, the Director for the City's Utilities Department, testified that once Stragapede logged in, he had no problems using the relevant computer applications, including Earth Net. *Id.* 352:17-19, 831:23-832:9. There was also evidence that Stragapede's computer problems could have been due to his computer "freezing," that is, the computer would not respond at all. *Id.* 468:12-20, 736:24-737:23, 832:7-9. Stragapede testified that on one occasion, he showed his frozen computer to Biner, who also "couldn't get it going." *Id.* 737:2-7. On all of this evidence, a jury could have concluded that three or four problems (at most) with logging in did not demonstrate an inability to work with a computer, especially when Stragapede did not have a problem using the computer applications.

Relying on a letter Dr. Grujic wrote to the City on September 9, 2010, the City also argues that Dr. Grujic's "unrebutted" testimony showed that Stragapede suffered from an executive dysfunction and that Stragapede could not perform the essential functions of his job.. Def.'s New Trial Br. at 5-6; Def.'s Trial Exh. 19, Grujic Letters at STRAGAPEDE000006 ("Based on the examples of 'real world' functioning that were provided, it does appear that Mr. Stragapede is not able to perform the essential functions of his job."). But the jury could have also believed that other testimony by Dr. Grujic showed that Stragapede *could* perform his job. For example, after meeting with Stragapede, Dr. Grujic had concluded in April 2010

that Stragapede had the knowledge, sensory skills, and motor skills to perform his job duties, and that Stragapede's injury was static, meaning that his memory problems would not worsen. Trial Tr. 775:5-11, 789:9-790:5; Grujic Letters at STRAGAPEDE000001 ("On the most recent neurological examination he has no motor or sensory deficits."). Dr. Grujic also opined that Stragapede was ready to return to work and recommended that the City test him with a "work trial," which the City did. Grujic Letters at STRAGAPEDE000001-03; Trial Tr. 775:24-776:4. Stragapede was cleared to return to work after passing that trial, which included a written test, a tool recognition exam, a meter repair, and a fieldwork component. Trial Tr. 224:2-226:4.

The evidence also supported a finding that Dr. Grujic's September 2010 conclusion—that Stragapede could not perform his job—was unreliable because Dr. Grujic arrived at that conclusion based on limited information. In contrast to Dr. Grujic's April 2010 decision, which was based on Dr. Grujic's own in-person observations of Stragapede, the September 9 letter was prepared in response to a request from Cheryl Chukwu, a City Human Resources Manager who provided Dr. Grujic with examples of Stragapede's alleged difficulties at work. *Id.* 780:3-783:11. Dr. Grujic admitted that he did not have any knowledge or background in the duties of a water service worker. *Id.* 776:9-16. He also admitted that he did not look at or consider the list of the essential functions of the job before making any conclusion as to whether or not Mr. Stragapede could perform these functions, *id.* 785:1-4, nor did he have any independent knowledge of Stragapede's real-world activities, *id.* 782:2-

11. Based on this evidence, a rational jury could conclude that Dr. Grujic's September 9 conclusion did not truly reflect Stragapede's abilities. The jury was also entitled to believe that Chukwu provided Dr. Grujic with only a few cherry-picked examples of Stragapede's performance, so that Dr. Grujic's conclusion was inevitable, or that Chukwu did not provide Dr. Grujic with accurate information. *Id.* 782:12-19. In other words, Dr. Grujic's September 9 opinion was only as reliable as the information provided by the City, so he—unlike the jury—did not get Stragapede's competing version of his job performance.

The City also points to Stragapede's multiple counseling sessions with his supervisors as evidence that he could not perform his duties. But the jury reasonably found that these counseling sessions concerned marginal issues that did not reflect Stragapede's abilities to do the essential functions of his job. For example, Bartus testified that he counseled Stragapede three times: once for returning to the plant due to computer issues, another time for attaching items to his laptop, and a third for driving through an intersection without looking up. *Id.* 505:5-19. The computer issues were discussed earlier in this Opinion, and the jury reasonably could believe that Stragapede was capable of using the computer. *See supra*. As to the other issues, the jury reasonably concluded that the problems did not really affect Stragapede's performance of his essential functions. For example, Stragapede was reprimanded for attaching a clipboard onto his laptop with Velcro in order to keep the items together, which presumably was against the City's policy. *Id.* 291:4-15, 292:5-17, 478:20-479:10. But David Stoneback (the director of the

entire utilities department) acknowledged that before September 2009 (when Stragapede was injured), City employees were allowed to put Velcro on the top of a laptop. *Id.* 292:18-23. And Vicki Biner (remember, she was the Meter Service Coordinator) admitted that there was no written policy against the Velcro; rather, the IT department had only made a verbal request that there be no add-ons to the computer equipment. *Id.* 840:7-14. Additionally, Stoneback admitted that he did not know why the IT department did not want a clipboard to sit on top of a laptop. *Id.* 294:1-5. So jurors could conclude that Stragapede did not know there was a ban on his home-made remedy for conveniently keeping the clipboard with the laptop. And they could readily find that the clipboard-Velcro issue was not a firing offense, but instead part of the pretext for disability discrimination.

The driving incident, which was the source of the third counseling session, was actually related to the clipboard issue. Stragapede was reprimanded for driving through an intersection without looking at the road, but that incident occurred when Stragapede reached down to pick up a clipboard that had fallen off his seat. *Id.* 913:23-914:24. When he drove through the intersection, the street was clear of pedestrians and the light was green, *id.*, so again the jury could conclude that this was a one-time, minor mistake. Indeed, Stoneback did not even ask Stragapede for his version of this incident, *id.* 297:12-16, lending further support for Stragapede's position that this too was pretext. Overall, in view of the record evidence, the jury reasonably concluded that the login, Velcro, and driving incidents were all minor issues unrelated to the essential functions of installing water meters,

troubleshooting water bills, conducting JULIE locates, taking water samples, and the like.

## B. Direct Threat Defense

Next, the City argues that it met its burden on the direct threat defense because the evidence conclusively showed that Stragapede posed "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). "The key inquiry when considering whether an employee is a direct threat is 'not ... whether a risk exists, but whether it is significant.'" *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998)). This risk assessment "must be based on medical or other objective evidence and the determination that a significant risk exists must be objectively reasonable." *Id.* (quotations omitted). In this case, the jury was instructed to consider the relevant factors of "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001) (citation omitted); R. 150, Jury Instructions at 23.

The jury reasonably concluded that Stragapede was not a safety risk based on the evidence. During his time back at work, there were no reports of any specific safety problems involving Stragapede. Trial Tr. 862:20-23, 863:13-16. To be sure, some City employees, such as Bartus, believed that Stragapede could not perform the job safely because—in generally worded testimony—"he[] [was] forgetful" and

"couldn't follow verbal instruction well," issues that could cause Stragapede to potentially "lose [his] place, not have a clear head while working in traffic, could step into traffic, get hurt, or hurt somebody else that's driving by." *Id.* 518:4-17. But there was also specific testimony to the contrary: Stragapede credibly testified that he was careful while on foot in the field and that he would wear a safety jacket. Trial Tr. 706:25-708:10. He also testified that he would turn on the flashers or the Mars light on the top of his truck when he was getting out of the car. *Id.* When Stragapede had to park his car on the side of the street, he would use his truck to block traffic and protect himself when getting out. *Id.* 707:22-24. The jury reasonably credited Stragapede's own specific testimony that he was conscientious about safety.

The only specific counter-examples offered by the City could readily be characterized as minor, if they were even relevant to showing a safety risk. First up is the same driving-through-the-intersection incident discussed above. *Id.* 479:8-10. As noted earlier, however, Stragapede explained that he was reaching down to pick up a clipboard that had fallen off his seat. *Id.* 913:23-914:19. He also testified that when he entered the intersection, the light was green and it was clear of pedestrians. *Id.* 913:20-24. The jury could reasonably find that this was an isolated, one-time incident unrelated to Stragapede's disability, and that his actions posed no safety risk (or that any safety risk was minor). This conclusion is also supported by Bartus's testimony that he was not concerned about Stragapede driving from the field to the plant, *id.* 467:24-468:1 ("Q: You were not concerned about his safety

driving back to the plant? A. No. he was operating his vehicle fine, I would guess"), and by Dr. Grujic's testimony that driving is a skill that "tends to be preserved with frontal injuries" like the one Stragapede suffered, especially when a person is driving in local, familiar areas, *id.* 790:13-791:8.

Similarly, the jury reasonably found that the other incidents offered by the City were unimportant. In one example, Stragapede was on Green Bay Road when he was supposed to be on Gross Point Road, an incident that Biner considered a safety concern because "he seemed like he was unsure of where he was." *Id.* 860:17-20. Biner further clarified that water safety workers are often alone and that it was unsafe to be driving in the wrong place or outside of Evanston. *Id.* 859:11-860:7, 904:23-907:7. But the jury could find that one instance of getting lost was not a safety issue, especially when Stragapede had no difficulty driving and had lived in Evanston for years. *Id.* 467:24-468:1. The City also points to one instance when Stragapede tripped on the stairs, without any further detail on what happened. *Id.* 998:12-17. Here too the jury could reasonably find that this was not a safety issue (especially when the City did not introduce any other details about the fall), but rather a common experience that could happen to anyone. In sum, the manifest weight of the evidence does not undermine the jury's conclusion that these sporadic issues did not pose a direct threat.

Lastly, the City relies again on Dr. Grujic's testimony in an effort to prove that Stragapede was a safety risk, but the City identifies no specific testimony about *safety*. In fact, in response to the question, "You do not have any opinion

based upon a reasonable degree of medical certainty as to whether Mr. Stragapede's brain injury caused him to have safety issues on the job; is that correct?", Dr. Grujic replied: "I don't know, since I'm not sure of their inner workings of the Water Department. I'm not sure what all the safety issues that are involved there." Trial Tr. 788:5-11. Flat out, Dr. Grujic did not formulate a medical opinion about Stragapede posing a safety risk. *Id.* 788:12-14. The City focuses on Dr. Grujic's September 9 letter, the one in which he opined that Stragapede could not perform the essential functions of his job (though the opinion was based only on the facts the City presented to the doctor). But as already discussed earlier in this Opinion, there was ample evidence to support the jury's finding that Stragapede *could* adequately perform his job, *see supra* Section I.A, and thus infer from that evidence that he could also do his job safely.

## C. Undue Hardship

The City's third argument ends up being directed at a straw-man: supposedly, Stragapede's disability could only be accommodated by having another employee accompany Stragapede all day, and that would be an unreasonable accommodation. Def.'s New Trial Br. at 9-10. When it comes to reasonable accommodations, under the ADA, an employer "must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996) (citation omitted). An employer does not have to provide a particular accommodation if the proposed accommodation would be an undue hardship

"requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). In assessing the reasonableness of an accommodation, the jury was instructed to consider factors including the cost of the accommodation, the City and Water Department's financial resources, and the manner in which the City conducted its operations. 42 U.S.C. § 12111(10)(B). Jury Instructions at 21-22.

The City directs its attack on the unreasonableness of having a co-worker accompany Stragapede during the workday. But the evidence does not support the premise of the argument: *Stragapede* never asked for that accommodation, and the City does not point to any evidence to that effect. Rather, this suggestion was originally made by *Dr. Grujic*, who even said that it was just one possible option, and not the only, or even a required, accommodation. Trial Tr. 785:24-787:5; Grujic Letters at STRAGAPEDE000006. What is more, the jury could reasonably find that Dr. Grujic made this suggestion in the abstract without considering any other possible accommodations, because the doctor "did not know the inner workings of the City Water Department" and had not considered the duties of a Water Service Worker in forming his opinion. Trial Tr. 776:9-11; 786:21-787:5.

Instead of the purported extra-worker accommodation, Stragapede requested less burdensome accommodations. Upon his return, the City agreed to provide software training and to allow Stragapede to keep paper, pencil, and a map with him at all times and to ask questions as needed. *Id.* 607:5-12; Pl's Trial Exh. 11, 6/7/10 Letter ("Also discussed last Friday, there will be training on the software and processes that were introduced just prior to and after you went on leave in

September 2009. In addition, you were advised to keep a pad of paper and pencil with you to take notes regarding your assignments, and to keep a map with you at all times."). But when Stragapede returned to work, Biner provided only one hour of formal training on the new software, which had been updated right before Stragapede went on disability. Trial Tr. 826:7-827:8. And Stragapede's supervisor, Bartus, never showed Stragapede how to shut down a computer, reboot it, or use any of the computer programs. *Id.* 484:1-7. Stragapede also testified that he requested a sticky note for his passwords, a computer that was programed so that he did not have to continually log in to his computer throughout the day, or authorization to call co-workers like Biner for password assistance from the field. *Id.* 735:18-738:1. Biner admitted that Stragapede only requested login assistance from the field three or four times during his month back, *id.* 898:8-13, and that using the sticky note and calling for assistance helped; as soon as Stragapede was able to log in, he had no additional computer issues, *id.* 352:17-19, 831:23-832:9. From this evidence, a reasonable jury could have concluded that there were non-disruptive and reasonable accommodations that the City could have implemented to help Stragapede fulfill the essential functions of his job.

### D. Discriminatory Intent

The City also argues that Stragapede failed to show discriminatory intent. Def.'s New Trial Br. at 11. Its first argument—that Stragapede "had to prove this fact through direct evidence, which he could not do"—is puzzling. *Id.* That is not an accurate statement of the law: "A disabled plaintiff can prove disability

14

discrimination by using either the direct or indirect method of proof," the latter which includes circumstantial evidence of discriminatory intent. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (citation omitted). Per the request and agreement by both parties, the Court instructed the jury that each side may present its case with direct or circumstantial evidence, and that the law makes no distinction between the weight given to each type. Jury Instructions at 11.

Also, as previously discussed, the jury reasonably found that Stragapede was capable of performing the essential functions of his job and that he did not pose a significant safety risk. *See supra* I.A-I.B. So for the same reasons, combined with the lack of follow-up in engaging with Stragapede (*e.g.*, Stoneback not asking for Stragapede's explanation of the driving-through-intersection incident), it would also be rational for the jury to conclude that Stragapede's firing was based on disability discrimination, including stereotyping based on his disability. In addition to that earlier-discussed evidence, Stragapede also pointed to the City's own words in a series of draft termination letters. In one August 5, 2010 draft, the City outright wrote that Stragapede's termination was "not due to discipline, but ... to [his] disability." Trial Tr. 375:20-376:2; Pl.'s Tr. Exh. 57, 10/5/10 Draft Letter at EV13420. A few days later on August 13, a City employee removed this statement, Trial Tr. 381:15-17; Pl.'s Trial Exh. 40, Termination Discussions at 1161, and Stoneback expressed concerns with providing information in the letter to "[Stragapede's] attorney who will use it against [the City] in the future." Trial Tr.

382:12-21; Pl.'s Trial Exh. 58, 9/23/10 Email at EV1343. Based on these communications, the jury reasonably concluded that the City fired Stragapede on the basis of his actual—or perceived—mental impairments.

In sum, for all of the issues that the City raised—essential job functions, safety risk, undue hardship, and discriminatory intent—the jury was presented with ample evidence on both sides of the aisle. "The fact that [the City] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed." *Lowe v. Consol. Freightways of Delaware, Inc.*, 177 F.3d 640, 643 (7th Cir. 1999). The jury reasonably found in favor of Stragapede. A new trial is not warranted because the jury simply did its job in the face of conflicting evidence—that is, weigh the evidence and "figure out who's telling the truth." *Id.*

### E. Alleged Attorney Misconduct

The City's final argument in support of a new trial is that Stragapede's counsel (1) violated a *motion in limine* ruling; and (2) inflamed the passion and prejudice of the jury in closing arguments. Def.'s New Trial Br. at 14-15.

"To obtain a new trial on attorney misconduct grounds, the defendants must show both that misconduct occurred and that it prejudiced their case." *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002) (citation omitted). Similarly, a new trial based on an evidentiary error is proper "only if the error has a substantial and injurious effect or influence on the determination of a jury.'" *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (citations omitted). As the City notes, Stragapede's counsel violated a *motion in limine* ruling when she stated in

front of the jury that the City allegedly had committed a discovery violation. Trial Tr. 258:14-17 ("Ms. Stevenson: Your Honor, I have a discovery violation … . We have a discovery violation."); R. 103, 2/17/15 Pre-Trial Order at 9 (ordering that the parties refrain from raising discovery disputes in the jury's presence).

These statements by Stragapede's counsel—which should not have happened in the jury's presence—did not, however, ultimately prejudice the City because the Court immediately instructed the jury to disregard counsel's statement. Trial Tr. 258:18-19 ("The Court: The jury will disregard that last statement. And we'll have another sidebar."). *See, e.g.*, *Viramontes v. City of Chicago*, 2015 WL 4637958, at *4 (N.D. Ill. Aug. 4, 2015) (when courts provide "a curative instruction, [they] presume that the jury followed that curative instruction."); *Thorncreek Apartments I, LLC v. Vill. of Park Forest*, 2015 WL 2444498, at *5 (N.D. Ill. May 20, 2015) (court's instruction to disregard testimony violating a *motion in limine* order cured any possible harm). In addition to the curative instruction, there are two other problems with the City's argument: first, the City did not object to the attorney's statement during the trial, and "[b]y failing to object, [the City] may not raise the issue for the first time in a motion for a new trial or on appeal." *Christmas v. City of Chicago*, 682 F.3d 632, 640 (7th Cir. 2012). Second, the City never requested the Court to issue any additional instruction at the time of the violation, so to the extent that the City believes a stronger curative instruction should have been delivered, the City forfeited that argument.

Turning to the City's second argument on alleged attorney misconduct, the City does not cite convincing examples of opposing counsel's attempts to inflame the jury in closing arguments. The City points to statements including: (1) "And why do I take exception to that behavior?", Trial Tr. 1143:22; (2) "And the attitude of the City is really what Mr. Farrar just said. Hey, Mr. Fix-it, go get a job at Home Depot. Gino is not Mr. Fix-it," *id.* 1185:5-7; and (3) "He told you he doesn't test well. And Mr. Farrar said it. The City of Evanston thinks he's Mr. Fix-it, go work at Home Depot, and get out of our hair. That's wrong," *id.* 1185:4-6. Def.'s New Trial. Br. at 15. But the City never objected to any of these statements during closing, so it again forfeits any argument to their impropriety. *Id.* 1143, 1185. These statements are also not so inflammatory that the jury would cast aside the instructions, which directed the jury to decide the issues based on evidence and not sympathy. Jury Instructions at 2. Indeed, the closing arguments were fairly based on evidence and responsive to the City's own arguments about what Stragapede should have done to mitigate damages after the firing. Attorneys are permitted to make non-legalese characterizations of the evidence and the other side's arguments, so long as the attack does not tell the jury to disregard the evidence or to decide based on emotions. The arguments presented by Stragapede's attorney in this case did not cross that line.

## F. Damages

As part of its new-trial motion, the City argues that Stragapede's compensatory and back pay awards are unreasonable. Def.'s New Trial Br. at 11-14.

Because the City elaborates on these same arguments in its brief supporting its motion for remittitur and to amend the judgment, R. 157 Def.'s Damages Mot.; R. 179, Def.'s Damages Br., the Court will address the damages issues in the later section addressing that motion. *See infra* Section III.

## II. Renewed Motion for Judgment as a Matter of Law

During the trial, and specifically after Stragapede's case-in-chief, the City moved for judgment as a matter of law under Rule 50(a); the Court denied the motion at that time. Trial Tr. 954:14-956:12. The City now renews its motion under Rule 50(b). R. 159. Rule 50 allows a court to enter judgment after "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). If the court does not grant the motion made during trial, the party may renew its motion after receiving an unfavorable verdict. Fed. R. Civ. P. 50(b). "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook Cty.*, 689 F.3d 655, 659 (7th Cir. 2012) (citations omitted). A jury's determination may be overturned only if "no rational jury could have found for plaintiff," and there must also be more than "a mere scintilla of supporting evidence." *Walker v. Bd. of Regents of Univ. of Wisconsin Sys.*, 410 F.3d 387, 393 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002)). The court must "not make credibility determinations or reweigh the evidence," and

"must disregard all evidence favorable to the moving party that the jury is not required to believe." *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000)).

## A. Procedural Bar

Before addressing the merits of the motion, Stragapede first argues that because the City made a Rule 50 motion at the close of Stragapede's case-in-chief but not at the close of *all* the evidence, the City's current motion is limited to the issues raised in its initial motion. R. 184, Pl.'s JMOL Resp. at 2. The City does not address this argument in its reply brief. R. 187, Def.'s Combined Reply.

It is true that "[b]ecause the Rule 50(b) motion is only a renewal of the [Rule 50(a)] preverdict motion, it can be granted only on grounds advanced in the preverdict motion." Fed. R. Civ. P. 50 Advisory Committee's Notes to 2006 amendment. And Rule 50(a) provides that motions must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "Thus, if a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object." *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010).

Here, after the close of Stragapede's case, the City moved for a directed verdict on the grounds that "the plaintiff was not qualified to perform the essential functions of the job in 2010 [and] that he did pose a safety risk … . And that a reasonable accommodation as proposed by him was not reasonable in the eyes of the City … ." Trial Tr. 954:14-25. Now, in its renewed motion, the City argues that (1)

Stragapede failed to show that he could perform the essential functions of his job; (2) the City met its burden on the direct threat defense; (3) the City met its burden on its undue hardship defense; and (4) Stragapede failed to establish discriminatory intent. R. 178, Def.'s JMOL Br. It seems that at the very most, the only additional issue in the City's post-verdict motion is that Stragapede did not show intentional discrimination. But because both parties addressed this argument at trial, it is proper for the City to now raise it in its renewed motion. Courts have explained that "[w]hether the grounds asserted on a renewed Rule 50 motion were sufficiently raised initially during the trial depends on whether the non-movant was made aware of those grounds and provided with an opportunity to address them." *Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 993 (W.D. Wis. 2002) (citing *Parts and Elec. Motors v. Sterling Elec. Inc.*, 826 F.2d 712, 716 (7th Cir. 1987)). During trial, the jury was instructed that in order to prevail on an ADA claim, Stragapede must prove that "Defendant would not have terminated Plaintiff, if Plaintiff had not had a disability, but everything else had been the same." Jury Instructions at 19. In other words, for Stragapede to win, the employer must have terminated the employee because of that disability. Both parties presented evidence on that issue at trial, so the City's Rule 50(b) argument regarding intentional discrimination "does not advance a novel theory of the case that would result in presentation of different evidence such that [the plaintiff] [is] somehow prejudiced." *Id.*

Similarly, the parties also raised the issue of intentional discrimination in their summary judgment briefings. Stragapede previously argued that "as a matter of law, Defendant discriminated against Plaintiff in discharging him based upon his disability," R. 29, Pl.'s MSJ Br. at 15, while the City argued that Stragapede failed to prove "that the City had a grand plan to terminate Plaintiff to start with," pointing instead to evidence that Stragapede caused the breakdown in the interactive process to negotiate potential accommodations, R. 58, Def.'s MSJ Reply at 5-9. So again, because both parties previously raised the intentional discrimination argument, there would be no prejudice to Stragapede if the Court addresses it in the City's post-verdict Rule 50(b) motion. *Tomao v. Abbot Labs., Inc.*, 2007 WL 2225905, at *5 (N.D. Ill. July 31, 2007) (evaluating Rule 50 after the 2006 amendments and concluding that where a party has previously raised an argument, "such a legal argument may be reviewed even in the absence of a specific Rule 50(a) motion to that effect." (citing *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718, 720 (7th Cir. 2003))).[3]

---

[3]The 2006 amendments to Rule 50 removed the requirement that a party must renew its motion as a matter of law at the close of *all* the evidence in order to preserve a post-verdict Rule 50(b) motion. Rule 50(a) now provides that a motion "may be made *at any time before the case is submitted to the jury*." Fed. R. Civ. P. 50(a)(2) (emphasis added). *See, e.g., Holder v. Illinois Dep't of Corr.*, 751 F.3d 486, 492 n.1 (7th Cir. 2014) ("Congress amended Fed.R.Civ.P. 50 rule slightly in 2006, removing the requirement of renewing a Rule 50 motion at the close of all evidence in order to preserve it for the verdict, although the requirement to renew a motion post-judgment remains."). So the City properly brings this post-verdict Rule 50(b) motion even though it moved for judgment as a matter of law after Stragapede's case-in-chief, without renewing the motion at the close of all the evidence.

The 2006 amendments, however, did not affect the analysis regarding the scope of the pre-verdict Rule 50(a) motion and post-verdict Rule 50(b) motion. Both before and after 2006, the Rule required that the pre- and post-verdict motions be grounded in the same law and facts. *Wallace*, 606 F.3d at 418.

## B. Rule 50(b) Motion

Moving on to the merits of the Rule 50(b) motion, the grounds advanced by the City for this motion are the same as those made in the new-trial motion. The only difference is that the City omits the arguments about the unreasonable damages awards and attorney misconduct made in its new-trial motion. Def.'s New Trial Br. at 11-15; Def.'s JMOL Br. The City argues in both motions that (1) Stragapede failed to show that he could perform the essential functions of his job; (2) the City met its burden on the direct threat defense; (3) the City met its burden on its undue hardship defense; and (4) Stragapede failed to establish discriminatory intent. *Id.* The defense arguments in both motions are premised on the same evidence; indeed, many of the sections are repeated verbatim. *Id.*

The Court has already denied the Rule 59 motion and similarly denies the Rule 50(b) motion. *See supra* Section I. This is because the standards for prevailing on a motion for judgment as a matter of law are even more demanding than a motion for a new trial. The Seventh Circuit has emphasized the difference between the two; a "motion for a judgment as a matter of law can be granted only if the court—after viewing the evidence in the light most favorable to the non-movant— believes that the evidence 'supports but one conclusion—the conclusion *not* drawn by the jury.'" *Mejia*, 650 F.3d at 634 (quoting *Ryl-Kuchar v. Care Centers*, 565 F.3d 1027, 1030 (7th Cir. 2009)) (emphasis in original). Under that standard, credibility determinations are for the jury, not for the judge. *Reeves*, 530 U.S. at 150-51. In contrast, "[i]n passing on a motion for new trial, the district court has the power to

get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth in trial." *Mejia*, 650 F.3d 633. In other words, the judge may provide "its own assessment of the evidence presented." *Id.* Additionally, the evidence must be weighed neutrally, rather than in a light favorable to the non-movant. *Id.* at 634. Thus, because the Court has already concluded that the verdict was not against the manifest weight of the evidence, *see supra* Section I, the Court must also conclude that a rational jury could have found for Stragapede when considering all inferences in his favor.

### III. Motion for Remittitur and to Amend the Judgement

### A. Compensatory Damages

The City also moves to reduce the compensatory damages award, arguing that it was "unreasonable" because "Plaintiff failed to prove with sufficient evidence that he was eligible to receive the monstrously excessive compensatory award of $225,000." Def.'s Damages Br. at 2. In reviewing a damages award, courts consider "whether (1) the award is monstrously excessive; (2) [whether] there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (citation and quotations omitted). The "monstrously excessive inquiry" is "simply … another way of asking whether there is a rational connection between the award and the evidence." *Harvey v. Office of*

*Banks & Real Estate*, 377 F.3d 698, 714 (7th Cir. 2004) (citation and quotations omitted).

The Court concludes that the $225,000 award is rationally based on the evidence. Both Stragapede and his wife, Geanine Stragapede, testified to Stragapede's emotional distress as a result of his job loss. Stragapede had worked for the City for 14 years, and the job was "what he likes to do. It's really his passion. He is proud to have worked for the City of Evanston." Trial Tr. 574:7-11. Although Stragapede was "reserved" during his recovery from his brain injury, once he returned from medical leave in June 2010, he started to feel "whole, [and] he had a meaning, worthiness. He felt on top of the world again." *Id.* 650:12-15. He was "ecstatic" to return to work because "he was going back to his job that he loved so much. And he was going back to something he was familiar with … ." *Id.* 573:7-15. The night before returning to work, "[h]e was like a 10 year old in a candy store … he was really happy because that night before he packed his lunch, laid out his work uniform, had everything all prepared." *Id.* 573:21-574:1. The morning of his work trial, he woke up before his alarm clock rang because he could not sleep and was so happy to be returning to work. *Id.* 574:2-11.

But after being put on administrative leave in July 2010, "you just started to see all of that start to slip away from him." *Id.* 650:16-17. Stragapede felt "flabbergasted," "stunned," and "upset" after having to pack up his belongings from 14 years on the job, and "[he] didn't know what [he] was going to do from that point." *Id.* 924:1-925:4. Losing his job was hard for Stragapede because he had

always worked. *Id.* 925:21-926:1. He stopped interacting with his friends because he was "ashamed" and "felt like he failed. He didn't feel he was equally to be with his friends because they all had a job and he didn't know what his job would be … ." *Id.* 650:18-651:2, 927:16-23. He also stopped interacting with his children because he felt like he set a poor example for them and could not be there for them. *Id.* 651:7-13. When Stragapede received his termination letter in September, "[h]e was totally shocked. That letter was like a bucket of salt poured into a healed wound for him. It just totally shattered him." *Id.* 651:22-651:2. The letter felt like "the final nail on the coffin." *Id.* 929:5-6. There was also testimony that Stragapede's disability caused the job loss to be particularly stressful because "he was really concerned about what his future was going to be. Because his job was what he knew. It's what he was able to do." *Id.* 652:14-24. Looking for a new job would be uniquely difficult because Stragapede's short-term memory issues made it more difficult to learn new things; "[a]nd due to his experience, he spent 14 years in one job. So the working world now would be very difficult for him." *Id.* And water service positions were not abundant—there were only two in all of Evanston. *Id.* 491:22-25. Finally, Stragapede also felt that he was not pulling his weight to provide for the family and has still not gotten over that feeling. *Id.* 930:12-17.

Relying on all that evidence, the jury rationally concluded that Stragapede intensely loved working for the City and was specifically passionate about a job that he had done for 14 years. The evidence showed that losing his job was especially devastating not only because his job was a source of pride and self-worth, but also

because finding a new job would be daunting when his disability affected his ability to learn new tasks quickly, and when all he knew for the last 14 years was how to be a water service worker. No doubt, $225,000 is on the very high side for a compensatory damages award in these circumstances. But given all of the testimony about Stragapede's devotion to his job, there was a rational relationship between the award and the evidence, and the jury reasonably believed that the Stragapedes were credible when assessing their account of emotional distress. Because "[i]t is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress, [] [the courts] shall not disturb those credibility determinations[.]" *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001).

In response, the City argues that Stragapede never sought professional help or therapy, and that his distress was "garden variety." Def.'s Damages Br. at 3. The Seventh Circuit rejected similar arguments when it upheld a remitted award of $175,000 because "[t]he record can be read as the story of a highly motivated female police officer, with a family heritage in law enforcement, being frustrated in her quest for greater responsibility" when she was denied a promotion. *Deloughery v. City of Chicago*, 422 F.3d 611, 620 (7th Cir. 2005). The district court properly concluded that even though the plaintiff never sought professional help, it was reasonable for the jury to believe that the plaintiff suffered and would continue to suffer "significant emotional distress" as a result of unlawful retaliation. *Id.* Similarly, in another case, the Seventh Circuit upheld an award when the plaintiff testified that he felt "low," "degraded," and "back-stabbed", deferring to "[t]he jury,

… [which] must have not believed that [the plaintiff] needed to show that he sought the help of psychologists or friends for his emotional distress or that he was required to provide more detail about either his emotional distress or the inconvenience that he experienced." *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001).

The City also argues that $225,000 is excessive compared to awards in similar cases. Def.'s Damages Br. at 3-4. But "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003). And "comparisons are rarely dispositive" because of the fact-specific nature of each case. *Id.* Indeed, the City's examples are distinguishable because they involve plaintiffs who found comparable employment within a short period of time and therefore did not suffer the same long-term emotional distress. Def.'s Damages Br. at 3-4 (citing *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 389 (7th Cir. 2011) (reducing $200,000 award because plaintiff found a job 10 days after she was terminated and "did not testify to any lasting emotional or physical ill-effects"); *Marion Cty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924 (7th Cir. 2010) (plaintiff had been working elsewhere part-time); *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1223-1229 (7th Cir. 1995) (plaintiff found a job three months after he was fired, and "in these circumstances a protracted bitterness from the firing … cannot be presumed and is not adequately established by [the plaintiff's] brief testimony.")). *Gracia* is also

distinguishable because the plaintiff was subject to Title VII's statutory cap, which is not a limit here. *Gracia v. Sigmatron Int'l, Inc.*, 102 F. Supp. 3d 983, 991 (N.D. Ill. 2015). In that case, the Court actually explained that despite the plaintiff's brief testimony about her emotional distress, the jury could have based its award on evidence that the plaintiff had worked continuously since the age of 16, was a valued employee, and could not find work despite looking for 16 months. *Id.* The Court only reduced the award because of the statutory cap, *id.*; if anything, *Gracia* actually counsels toward deferring to the jury's compensatory damages award in this case.

Finally, the City argues that the damages award was excessive because it was grounded in sympathy, passion, and prejudice. Def.'s Damages Br. at 4. But "since we have determined that the verdict was supported by the evidence, then necessarily it was not a result of passion and prejudice." *Tullis*, 243 F.3d at 1069. In any event, the City's argument is unpersuasive. It relies on a note the jury sent the Court during deliberations, asking: "Judge, if the vote favors the plaintiff, but we determine that no money is awarded for emotional pain and suffering, does the Court continue to calculate wages and benefits to award to plaintiff?" Trial Tr. 1189:5-8. With both parties' agreement, the Court told the jury: "In response to your question, on whether the Court would calculate lost wages and benefits, the answer to that question is not a factor for you to consider in determining your verdict." *Id.* 1189:22-25. From these communications, the City infers that the jury must have acted out of passion because "[the note] indicate[s] the distinct possibility that the

jury was concerned Plaintiff would be awarded no money if liability was not assessed against the City." Def.'s Damages Br. at 4. But this is speculation; it would be impossible and improper to extrapolate any subtext from the jury's question. The Court instructed the jury as to the applicable standards for determining compensatory damages, Jury Instructions at 25, and to *not* consider the issue of the plaintiff's lost wages and benefits, Trial Tr. 1189:22-25. There is no basis to conclude that the jury did not follow the Court's instruction or that its award was rooted in passion or prejudice. Also, based on the Court's experience in speaking with juries after many trials, trying to interpret what the jury was precisely thinking can be an unsound guessing game. Sometimes jurors are trying to satisfy the mistaken concern or the simple curiosity of a single juror, who then is readily convinced by other jurors. Other times, the jurors have misunderstood an instruction and writes a note, but then the answer clarifies the instruction so that the original question was not even indicative of a particular problem. These are non-lawyers writing questions on legal issues, so a trial court ought to be confident that a jury note really proves that a vacatur of a judgment (or a reduction in damages) is necessary before pulling that trigger. Here, there is no reason to believe that the jury refused to follow the Court's clarifying instruction.[4]

---

[4]In its motion for a new trial, the City also makes the same argument that it made in its remittitur motion—that the compensatory damages award was unreasonable. Def.'s New Trial Br. at 11-14. The standards for determining excessive damages are the same in a motion for new trial and motion for remittitur. In both instances, the motion can be granted "only if the verdict is monstrously excessive or if there is no rational connection between the evidence on damages and the verdict." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 516 (7th Cir. 1993) (citation and quotations omitted). So the Court reaches the same conclusion in both motions.

## B. Back Pay Award

Finally, the City moves to alter or amend the judgment under Rule 59(e), arguing that the back pay award should be reduced because it included time after January 1, 2013, when Stragapede admitted that he stopped diligently looking for work. Def.'s Damages Br. at 5-9; R. 151, Equitable Remedies Order. "To prevail on a Rule 59(e) motion to amend judgment, a party must clearly establish (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) (citation and quotations omitted). "A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (citations and quotations omitted).

Here, the City does not present new evidence but argues that the Court committed a manifest error of law when it concluded that Stragapede's back pay award should not be reduced for failure to mitigate, even though Stragapede was not reasonably diligent in finding work from 2013 onward. Equitable Remedies Order at 7-10. After analyzing Seventh Circuit precedent, the Court previously concluded that it was the City's burden to prove "*both* that the claimants were not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance that the claimants might have found comparable employment." *Id.* at 10. Even though the City proved the former,

it presented no evidence as to the latter. *Id.* The City essentially repeats the same arguments and cites the same cases from its prior damages briefing, R. 140, all of which the Court considered in the equitable-damages opinion. Specifically, the City argues that the Court did not adequately consider *Payne v. Security Savings and Loan Association, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991), in which the Seventh Circuit upheld the district court's ruling that the plaintiff did not take reasonably diligent steps to mitigate after "his job search had slowed to a trickle."

The Court did, however, consider *Payne* but nevertheless held that the Seventh Circuit requires an employer to show a reasonable chance of finding comparable employment. Equitable Remedies Order at 10. In coming to this conclusion, the Court cited *E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990); *United States v. City of Chicago*, 853 F.2d 572, 578 (7th Cir. 1988); and *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986), cases that are consistent with numerous other decisions throughout the circuit. Equitable Remedies Order at 10; *see also E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1581 (7th Cir. 1997) ("the employer must prove both that the [claimants were] not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance that the [claimants] might have found comparable employment." (citation and quotations omitted)); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) ("To establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendants must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her

damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence." (citation omitted)); *Sommerfield v. City of Chicago Sergeant Knasiak*, 2015 WL 7077241, at *8 (N.D. Ill. Nov. 13, 2015) (same); *Coffey v. DSW Shoe Warehouse, Inc.*, 2015 WL 6560525, at *6 (N.D. Ill. Oct. 29, 2015) (same); *Coleman v. Lane*, 949 F. Supp. 604, 608 (N.D. Ill. 1996) (same).

For example, in *Ilona of Hungary, Inc.*, the Seventh Circuit explained that even though a former employee "had abandoned her job search less than six months after her termination," the defendant employer "pointed to no steps that [the former employee] should have taken in order to find comparable employment that she did not, nor has it shown that comparable jobs were available for which [she] failed to apply." 108 F.3d at 1581. These facts would help show that the plaintiff did not "demonstrate[] an honest, good faith effort to locate comparable employment." *Id.* at 1052. This is consistent with the Court's prior explanation of the rationale behind requiring the employer to show the availability of comparable jobs: "The reasoning … makes sense: an employee might stop looking for work if none is available, and under that circumstance, the plaintiff's decision to stop looking would itself be reasonable." Equitable Remedies Order at 10. Because the Seventh Circuit has expressly adopted the requirement that the defendant prove that comparable employment exists, the cases that the City cites in response are not dispositive because they do not repudiate or even discuss this requirement. Def.'s Damages Br. at 5-9 (citing *Franzen v. Ellis Corporation*, 543 F.3d 420 (7th Cir. 2008); *Payne,* 924

F.2d at 109; *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417 (7th Cir. 1986)). Thus, the Court maintains its prior conclusion that the burden to prove failure to mitigate rests on the defense, and that the City did not show that there was a reasonable chance Stragapede might have found comparable employment.[5]

### IV. Conclusion

For the reasons explained above, the City's motions for a new trial [R. 155], for remittitur and to amend the judgment [R. 157], and for judgment as a matter of law [R. 159] are denied in their entirety.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 22, 2016

---

[5]The City also moved for a new trial on the issue of back pay, making the same argument that the award should not have included the period after January 1, 2013. Def.'s New Trial Br. at 13-14. The Court considers the issue under a Rule 59(e) motion to amend the judgment, because the issue of back pay was determined by the Court and not the jury.